Ellis SIMON; Trudy Hunt; Tony Younany; George Oko; Jacqueline Hounchell; Sylvia Whol, Larry Abbott; Estate of George E. Patterson; Estate of Willie Grier; Estate of Joyce Fogliano; Estate of Virginia Overstreet; Estate of Evelyn Schrieber; and Estate of Stanley Kesselman, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

PHILIP MORRIS INCORPORATED; R.J. Reynolds Tobacco Company; Brown and Williamson Tobacco Corporation; B.A.T. Industries, P.L.C.; the American Tobacco Company; Lorillard Tobacco Company, Inc.; and Liggett & Myers, Inc., Defendants. (Simon I)

No. 99 CV 1988.

United States District Court, E.D. New York.

Feb. 8, 2001.

Law Offices of Peter G. Angelos, P.C., by Joshua Kassner, Baltimore, MD, John Angelos, O'Donoghue & O'Donoghue, Washington, D.C., for National Asbestos.

Milberg Weiss Bershad Hynes & Lerach, by Melvyn I. Weiss, Beth A. Kaswan, Michael C. Spencer, New York City, for Bergeron.

Dewey Ballantine, LLP, by Vincent Fitzpatrick, Heather K. McDevitt, Joseph Angland, New York City, for Blue Cross/Blue Shield.

Weitz & Luxenberg, by Richard L. Akel, Lieff, Cabraser, Heimann & Bernstein, by Steven E. Fineman, Elizabeth J. Cabraser, New York City, Roda & Nast, P.C., by Dianne M. Nast, Lancaster, PA, Waite, Schneider, Bayless & Chesley, by Stanley Chesley, Cincinnati, OH, Jonathan W. Cuneo, Washington, DC, Brown, Rudnick, Freed & Gesmer, by Gregory T. Carnold, Wayne F. Dennison, Boston, MA, Sheller Ludwig &

Badey, P.C., by Charles Mangan, Philadelphia, PA, for Simon I & Simon II.

Ness Motley Loadholt, Richardson & Poole, P.A., Mount Pleasant, S.C., Orrick, Herrington & Sutcliffe, LLP, New York City, by Peter A. Bicks, James L. Stengel, Michael T. Stolper, for Falise.

Sedgwick, Detert, Moran & Arnold, by Kevin J. Dunne, Eric M. Kraus, Kirkland & Ellis, by Marjorie P. Lindblom, David Bernick, Andrew R. McGaan, Deirdre A. Fox, New York City, for Brown & Williamson.

Shook, Hardy & Bacon, LLP, by William L. Allinder, Lori Connors McGroder, Kansas City, MO, for Lorillard Tobacco Co.

Jones, Day, Reavis & Pogue, by Harold Keith Gordon, Byron G. Stier, New York City, Jones, Day, Reavis & Pogue, by Hugh R. Whiting, Theodore M. Grossman, Mark A. Belasic, Cleveland, OH, Jones, Day, Reavis & Pogue, by Jerome R. Doak, Margaret I. Lyle, Dallas, TX, Womble Carlyle Sandridge & Rice, PLLC, by Ursula M. Henninger, Winston–Salem, NC, Collier, Shannon, Rill & Scott, PLLC, by John B. Williams, Thomas W. Mitchell, Washington, DC, for R.J. Reynolds.

Greenberg Traurig, LLP, by Alan Mansfield, Robert J. Kirshenberg, Stephen L. Saxl, New York City, for Lorillard Tobacco.

Simpson Thacher & Bartlett, by Adam I. Stein, New York City, for British American Tobacco.

Goodwin, Proctor & Hoar, LLP, by U. Gwyn Williams, Boston, MA, Winston & Strawn, Chicago, IL, Dechert Price & Rhoads, by Peter L. Critchell, New York City, Goodwin, Proctor & Hoar, by Kenneth J. Parsigian, Paul E. Namser, Boston, MA, Arnold & Porter, by Murray R. Garnick, Peter Bleakley, Washington, DC, for Philip Morris.

Debevoise & Plimpton, by Anne E. Cohen, Harry Zirlin, Steven S. Michaels, New York City, for Council for Tobacco Research USA, Inc.

Davis & Gilbert LLP, by Bruce J. Ginsberg, New York City, for Hill & Knowlton.

Seward & Kissel LLP, by Jacob Horowitz, New York City, for Tobacco Institute.

Jacob Medinger & Finnegan, by Bryan A. McKenna, New York City, for Smokeless Tobacco.

Skadden, Arps, Slate, Meagher & Flom, by Peter J. McKenna, Eric S. Sarner, Arthur H. Aizley, New York City, for U.S. Tobacco.

Kasowitz, Benson, Torres & Friedman, by Leonard A. Feiwus, New York City, for Liggett.

Chadbourne & Parke, LLP, by Robert S. Pruyne, New York City, for British American Tobacco.

## PRELIMINARY MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. *Introduction* .................................................. 23

II. *Broad Discretion of Trial Judges to Sever Issues for Trial* ........................ 25
    A. History ................................................ 25
        1. English Practice ....................................... 25
        2. Early American Practice ................................ 26
    B. Modern Authority ...................................... 26
        1. Federal ............................................. 26
            a. Federal Rule of Civil Procedure 42(b) ............................ 27
            b. Federal Rule of Civil Procedure 16 ............................... 27
            c. Federal Rule of Civil Procedure 23(c)(4)(A) ....................... 28
        2. State ................................................ 31
    C. Simple Bifurcation Cases: Severing Liability from Damages ................. 31
    D. Multiple Trial Splitting and Partial Certification in Complex Litigation ...... 32

III. *Seventh Amendment's Confirmation of Discretion* ............................ 33
    A. History of the Seventh Amendment ...................................... 33

    1.   Limiting Appellate Control over Juries ................................ 33
    2.   Roles of Trial Judges and Appellate Courts ........................... 34
  B.   *Gasoline Products:* Avoiding "Confusion" and "Uncertainty" ............... 36
  C.   Utilizing Separate Juries ............................................. 38
    1.   Simple Bifurcation ............................................... 38
    2.   Class and Related Actions ......................................... 39

IV.  *Broad Discretion to Sever Issues for Trial in Mass Tort Cases* ................... 40
  A.   Class Certification Orders Are Not Final Judgements ....................... 40
  B.   Public Policy ........................................................ 43
  C.   Deviant Cases ....................................................... 47

V.  *Application to Simon II* ...................................................... 49
  A.   Severing in Opt-out Compensatory Class and Non-opt-out Punitive Class
      under Rule 42(b) May Be Appropriate ................................. 49
  B.   Certifying to Resolve General Compensatory Liability under Rule
      23(c)(4)(A) May Be Appropriate- ..................................... 50

VI.  *Summary* ................................................................. 51

VII.  *Conclusion* ............................................................... 51

## I. *Introduction*

In this and related class actions by those claimed to have been injured directly and indirectly by smoking, a number of theoretical and practical problems are raised. *See, e.g., Simon v. Philip Morris, Inc.,* 124 F.Supp.2d 46 (E.D.N.Y.2000) (choice of law). This memorandum deals preliminarily with the issue of severance of issues for trial.

It is contended that a trial judge's authority in a class action to sever issues for trial before different juries is seriously circumscribed by the Seventh Amendment to the United States Constitution. It would be strange if that Amendment, designed to restrict appellate power, were interpreted to eviscerate that of the trial judge and jury to effectively adjudicate complex cases. As demonstrated below, there is no basis for such a perverse reading of the Constitution.

An opt-out compensatory class with subclasses is sought to be certified for trial in *Simon II* with: (a) some test cases tried in full in this court before a single jury, and general fraud and related compensatory liability decided as to the rest of the class by the same jury; (b) individual issues such as statutes of limitations, reliance and individual damages referred to appropriate district courts to resolve individual compensatory claims and defenses; and (c) a non-opt-out punitive damage class certified covering all Tobacco claims for punitive damages with the same jury that decided the issues in (a)

determining punitive damages, if any. The motion for certification is to be argued shortly.

The question now addressed is whether the proposed procedure for severance of issues and trials before the same and separate juries would constitute a violation of the Seventh Amendment right to a jury trial. Suggesting that the answer is "no" are Anglo–American procedural history and the Seventh Amendment; the role of district judges and juries vis-à-vis each other and appellate courts; and public policy favoring the efficient and fair determination of mass torts on the merits, utilizing flexible class actions where they are appropriate. *See, e.g.,* Fed. R.Civ.P. 1, 16, 23(c)(4)(A), 42(b).

Part II of this memorandum details the historical roots of the trial judge's broad discretion to sever issues for trial; included is a discussion of the Federal Rules of Civil Procedure, which grant federal district judges authority to structure complex litigation efficiently. Part III explains that the Constitution does not limit this broad discretion to sever issues for trial; to the contrary, the Seventh Amendment is only implicated where a severed issue is presented to a subsequent jury in a confusing or uncertain manner; in both simple and complex cases, trial judges enjoy broad power to employ procedural devices such as the special verdict to ensure that when issues are severed for

separate trial the respective juries comprehend the proper scope of their inquiry. Part IV explains why a recent minority line of limiting cases is inapposite. Finally, Part V explains how bifurcation of punitive damage and general compensatory damage issues comports with Rule 42(b) and Rule 23(c)(4)(A) as well as with the general principles discussed in Parts II, III, and IV.

## II. Broad Discretion of Trial Judge to Sever Issues for Trial

"There has gradually crept into our law through rule, statute and case law development widespread severance of issues in many types of litigation." Note, Bifurcation of Jury Negligence Trials, 14 Vand. L.Rev. 831, 840 (1961). Trial judges regularly employ a wide range of procedures that may result in the severance of issues for trial. For example, summary judgment in favor of the plaintiff on the issue of liability results in a separate trial of damages and a successful plea of collateral estoppel may bar further litigation of one issue in a case. See id. at 841.

More specifically, federal and state trial judges have the discretion to decide to try different issues before two different juries in a process commonly known as bifurcation. Further trial splittings such as trifurcation are also utilized. Sometimes damages are tried before liability in a process known as "reverse bifurcation" to encourage settlement and shortening of the trial.

This severance procedure is enshrined as a general American policy in countless statutes, rules, casebooks, hornbooks and treatises. See, e.g., 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 2388 (2d ed.1995) ("Ultimately, the question of separate trials ... should be, and is, a matter left to the discretion of the trial court on the basis of the circumstances of the litigation before it."); Moore's Federal Practice § 42.20[4][a] (Lexis Publishing et al. eds., 3d ed.2000) ("the courts have broad authority to try issues and claims separately"); Harold L. Korn et al., New York Civil Practice: CPLR ¶ 603.01 (2000) ("the decision to order severance or separate trials is left almost entirely to the discretion of the court"); Fla. R. Civ.

P. Rule 1.270 (2000 Supp.); James W. Smith & Hiller B. Zobel, 8 Mass. Prac. Rules Practice R 42 Decisions (2000 ed.) (trial judges have "extensive discretion" to sever issues for trial) (internal citations omitted); 1B N.J. Prac. Court Rules Annotated R 4:38–2 (5th ed.2000) ("Motion for severance is directed at sound discretion of trial court") (citing Wojcik v. Pollock, 97 N.J.Super. 319, 235 A.2d 58 (Law Div. 1967)); 2 Baldwin's Oh. Prac. Civ. Prac. R 42 (2000 Supp.) ("The determination to conduct separate trials is committed to the sound discretion of the trial court."); 16 Standard Pa. Prac.2d § 91:87 (2000 Supp.) ("Bifurcation is a matter entrusted to the trial court's discretion; and the trial court's decision to bifurcate will not be disturbed on appeal, absent an abuse of discretion"); 3 Cal. Civ. Prac. Proc. § 25:17 (1999 ed.) ("The court has the discretion and the power to order a separate trial of any cause of action"); 34 Ill. Law and Prac. Trial § 5 (1999 ed.) ("A motion to sever issues for separate trial is ... addressed to the sound discretion of the trial judge") (internal citations omitted); 21 Md. Law Encyclopedia Trial § 5 (1997 ed.) ("[T]he court, on motion or on its own initiative, may order a separate trial of ... any separate issue ... or issues. Such an order is a matter within the trial court's discretion.").

### A. History

#### 1. English Practice

In the common-law courts of England, trial judges enjoyed broad discretion to sever issues for trial. See Rules of the English Supreme Court of Judicature (1883) order 36, rule 8 ("[T]he court or judge may, in any case or matter, at any time or from time to time, order that ... one or more questions of fact be tried before the others ... and in all cases may order that one or more issues of fact be tried before any other or others."). Ordering separate trials of liability and damages, for example, was commonplace in the seventeenth-century action of account-render. Lewis Mayers, Severance for Trial of Liability from Damage, 86 U. Penn. L.Rev. 389, 391 (1938). The two-stage procedure in

this common-law action was described by Blackstone:

> [U]pon a stated account between two merchants ... the law implies that he, against whom the balance appears, has engaged to pay it to the other; though there may not be any actual promise. But if no account has been made up, then the legal remedy is by bringing a writ of *account de computo;* commanding the defendant to render a just account to the plaintiff, or show the court good cause to the contrary. In this action, if the plaintiff succeeds, there are two judgments: the first is, that the defendant do account before auditors appointed by the court; and, when such account is finished, then the second judgment is, that he do pay the plaintiff so much as he is found in arrear.

William Blackstone, *Commentaries,* *164. Equitable accounting actions were also regularly bifurcated into liability and damage phases. *See* Lewis Mayers, *Severance for Trial of Liability from Damage,* 86 U. Penn. L.Rev. 389, 391 (1938); *see also* Stephen S. Gensler, *Bifurcation Unbound,* 75 Wash. L.Rev. 705, 706 n. 2 (2000) (bifurcating liability and damage in equitable actions was common practice in seventeenth- and eighteenth-century England).

### 2. Early American Practice

Prior to the promulgation of the Federal Rules of Civil Procedure, which merged law and equity, federal trial judges sitting in equity regularly severed issues for separate trial under Equity Rule 29. It stated in pertinent part: "Every such point of law going to the whole or a material part of cause or causes of action stated in the bill may be called up and disposed of before final hearing, at the discretion of the court." Equity Rule 29 (1911); *see also Finley v. Asphalt Paving Co.,* 69 F.2d 498, 498 (8th Cir.1934) (permitting separate trial on a licensing defense in patent infringement suit); *Allen v. Philadelphia Co.,* 265 F. 817, 821 (3d Cir. 1920) (same); Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b) Class Actions: History, Policy, Problems, and a Solution,* 36 SW. L.J. 743, 743 (1982) (*citing* Equity Rule 29 (1911)).

Early federal and state judges also severed issues for trial before separate juries in actions at law. *See Gasoline Products Co., Inc. v. Champlin Refining Co.,* 283 U.S. 494, 497–98, 51 S.Ct. 513, 514, 75 L.Ed. 1188 (1931) (citing cases supporting view that a partial new trial may be ordered, with the effect that a separate jury will decide separate damages, as long as the damage issue is not "so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty"); Lewis Mayers, *Severance for Trial of Liability from Damage,* 86 U. Penn. L.Rev. 389, 398 (1938) (referring to a 1907 New York statute providing that "[t]he court, in its discretion, may order one or more issues to be separately tried prior to any trial of the other issues in the case.") (internal citations omitted).

### B. Modern Authority
#### 1. Federal

The language and spirit of the Federal Rules of Civil Procedure provide trial judges with the authority to structure trials efficiently and fairly. Rule 1 of the Federal Rule of Civil Procedure sets out the scope and purpose of the Rules as follows: "These rules ... shall be construed and administered to secure the just, speedy, and *inexpensive* determination of every action." Fed. R.Civ.P. 1 (emphasis added). To that end, the drafters of the Federal Rules of Civil Procedure insisted that trial judges have an affirmative duty to exercise their authority to ensure the availability of a fair and efficient remedy for every wrong so that "civil litigation is resolved not only fairly, but also without undue cost or delay." Fed.R.Civ.P. 1 advisory committee's note (1993). Other Rules emphasize that to fulfill this overarching purpose, trial judges must assume the role of a litigation manager who actively controls and shapes cases. *See, e.g.,* Fed. R.Civ.P. 16 advisory committee's notes (1983) ("[W]hen a trial judge intervenes personally at an early stage to assume judicial control over a case and to schedule dates ... the case is disposed of by settlement or trial more efficiently and with less cost and delay than when the parties are left to their own

devices."); *see also* Manual for Complex Litigation § 20.1 (3d ed., 1995) ("The Federal Rules of Civil Procedure . . . contain numerous grants of authority that supplement the court's inherent power to manage litigation.") (internal citations omitted).

Severance of issues is one of the trial judge's most useful trial management devices to ensure the just and efficient determination of civil actions as required by Rule 1. In codifying trial courts' broad discretion to sever issues for trial, the drafters of the Federal Rules of Civil Procedure provided federal district judges with a tool to separate claims and issues brought together under the Rules' liberal joinder provisions. *See Note, Separate Trial of a Claim or Issue in Modern Pleading: Rule 42(b) of the Federal Rules of Civil Procedure,* 39 Minn. L.Rev. 743, 745–59 (1955). This separation, the drafters reasoned, would help avoid excessive confusion or prejudice due to overly complex or inappropriately joined trials. *See* Albert P. Bedecarre, *Comment, Rule 42(b) Bifurcation at an Extreme: Polyfurcation of Liability Issues in Environmental Tort Cases,* 17 B.C. Envtl. Aff. L.Rev. 123, 126 (1989). As explained below, the Federal Rules of Civil Procedure contain a number of provisions that codify the trial judge's almost unlimited power to sever issues for trial.

a. Federal Rule of Civil Procedure Rule 42(b)

Rule 42(b) provides that a judge may separate any issue of a cause of action, thus creating a series of component stages. Each issue is tried successively, with plaintiffs having to survive each step in order to progress to the next, and ultimately to be awarded any remedy:

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, *or of any separate issue* or of any number of claims, cross-claims, counterclaims, third-party claims, *or issues,* always preserving inviolate the right of trial by jury as declared by the Seventh

Amendment to the Constitution or as given by a statute of the United States.

Fed.R.Civ.P. 42(b) (emphasis added). On its face, Rule 42(b) encourages the severing of issues for trial, guaranteeing trial judges optimum flexibility in structuring litigation with an eye toward providing a fair and efficient remedy. The three allowable grounds for a bifurcation decision—furthering convenience, avoiding prejudice and furthering expedition and economy—are set out in the alternative, so that the presence of any one is sufficient to sustain such an order. *See In re Paris Air Crash of March 3, 1974,* 69 F.R.D. 310, 318–19 (C.D.Cal.1975); *see also* 9 Wright & Miller, Federal Practice and Procedure § 2388, at 277 (1971 & Supp.1982).

The drafters of Rule 42(b) commented that "[w]hile separation of issues for trial is not to be routinely ordered, it is important that it be encouraged where experience has demonstrated its worth," citing *Note, Routine Bifurcation of Negligence Trials* 14 Vand. L.Rev. 831, 831 (1961), as support for their assertion. Fed.R.Civ.P. 42(b) advisory committee's note (1966). This statement did not limit in any way the trial judge's historic discretion to sever issues for trial in individual cases. The drafters recognized that the severance of issues for trial was a useful procedure whenever difficulty in proving one issue may warrant its being postponed as well as in complex litigations, where liability is a common issue for all of the plaintiffs, but damages differ for each party. *See Note, Routine Bifurcation of Negligence Trials,* 14 Vand. L.Rev. 831, 840–41 (1961).

b. Federal Rule of Civil Procedure 16(c)(13)

Federal Rule of Civil Procedure 16 makes scheduling and case management an express goal of pretrial procedure, stating in pertinent part: "In any action, the court may in its discretion direct the attorneys for the parties and any unrepresented parties to appear before it for a conference . . . establishing early and continuing control so that the case will not be protracted because of lack of management." *See* Fed.R.Civ.P. 16(a); *see also* Fed.R.Civ.P. 16(a) advisory committee's notes (1983). Recent amendments to Rule

16 emphasize the court's power to structure litigation. *See* Civil Justice Reform Act of 1990 § 102(2), 28 U.S.C. § 471 ("Evidence suggests that an effective litigation management and cost and delay reduction program should incorporate several interrelated principles, including the differential treatment of cases that provides for individualized and specific management according to their needs, complexity, duration, and probable litigation careers") (internal quotations and citations omitted); *see also* Judith Resnik, *Litigating and Settling Class Actions: The Prerequisites of Entry and Exit*, 30 U.C. Davis Law Review 835, 836 (1997) ("Revisions to Rule 16 of the Federal Rules, local rules in many districts, and the Civil Justice Reform Act all call for judges to control litigation and, if possible, to help create conditions under which settlement can occur."); Judith Resnik, *Aggregation, Settlement, and Dismay*, 80 Cornell L.Rev. 918, 937 (1995) ("Over the past forty years, the judicial role has been reformulated, creating the managerial judge, now codified by means of Rule 16 of the Federal Rules of Civil Procedure and by the Civil Justice Reform Act of 1990.").

Rule 16(c)(13) specifically lists the severing of issues for trial as an appropriate subject for an order resulting from the pretrial conference:

> At any conference under this rule consideration may be given, and the court may take appropriate action, with respect to ... an order for a separate trial pursuant to Rule 42(b) with respect to a claim, counterclaim, cross-claim, or third-party claim, *or with respect to any particular issue in the case.*

Fed.R.Civ.P. 16(c)(13) (emphasis added). The drafters of Rule 16 included the severing of issues for trial as a subject for the pretrial conference "to eliminate questions that have occasionally been raised regarding the authority of the court to make appropriate orders designed either to facilitate settlement or to provide for an efficient and economical trial," demonstrating once again the procedure's integral role in fulfilling the drafters' intent to provide a fair and efficient remedy for every wrong. Fed.R.Civ.P. 16(c) advisory committee's notes (1993).

### c. Federal Rule of Civil Procedure 23(c)(4)(A)

The trial court's discretion to sever issues for trial also has a significant impact on joinder decisions. Despite the trial judge's broad discretion to sever issues for trial pursuant to Rule 42(b), trial courts were sometimes limited in their ability to structure complex litigations to meet the class certification requirements of Rule 23. Federal courts at times found themselves hampered in their capacity to resolve some mass tort disputes requiring resolution through a class action. *See* Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b) Class Actions: History, Policy, Problems and a Solution,* 36 SW. L.J. 743, 747 (1982). Rule 23(a) requires that putative class members demonstrate the existence of class-wide common interests to proceed as a class action. *See* Fed.R.Civ.P. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all only if ... there are questions of law or fact common to the class"). Although each member of a putative mass tort class is likely to have been subject to the same misconduct by the defendant, the extent of exposure and the level of resultant harm could vary greatly. *See* Fed.R.Civ.P. 23(a) (requiring putative class members to demonstrate that there are "questions of law or fact *common* to the class," and that "the claims or defenses of the representative parties are *typical* of the claims or defenses of the class") (emphasis added); *see also Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1200 (6th Cir.1988) ("the main problem on review [in many mass tort cases] stems from a failure to differentiate between the general and the particular;" "a kind of generic causation" as compared to "individual causation"). Bifurcating issues under Rule 42(b) arguably did not suffice to meet the class certification requirements where the putative class members could only establish the prerequisites of Rule 23(a) as to certain issues or subgroups of plaintiffs. *See, e.g., Hansberry v. Lee,* 311 U.S. 32, 46, 61 S.Ct. 115, 120, 85 L.Ed. 22 (1940) (landowners seeking to secure the benefits of a racially restrictive covenant could not bind

within the same class claimants attempting to challenge the covenant).

To meet any potential difficulty with severances in class actions, the Federal Rules of Civil Procedure controlling class actions were amended in 1966 to include Rule 23(c)(4)(A). *See generally* Fed.R.Civ.P. 23(c)(4)(A) advisory committee's notes (1966). Rule 23(c)(4)(A) states in pertinent part: "When appropriate an action may be brought or maintained as a class action with respect to particular issues." Fed.R.Civ.P. 23(c)(4)(A); *see also* Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b) Class Actions: History, Policy, Problems, and a Solution,* 36 SW. L.J. 743, 747 (1982). Rule 23(c)(4)(A) accords district judges the discretion to certify a class action as to particular issues in a manner that "treat[s] common things in common and distinguish[es] the distinguishable," thereby satisfying Rule 23(a)'s requirements of commonality and typicality. *See id.* (citations and quotations omitted). Since a district judge certifies an issue class pursuant to Rule 23(c)(4)(A), it follows that separate juries may decide different issues. One jury will render a verdict as to the common, certifiable issues. In many instances it would be impracticable to expect that same jury to be empaneled long enough to resolve all of the noncertified issues of each class member as well. *See* Lesley Frieder Wolf, *Evading Friendly Fire: Achieving Class Certification After the Civil Rights Act of 1991,* 100 Colum. L.Rev. 1847, 1856 (2000).

The language of Rule 23(c)(4)(A), the provision's structural relationship with Rule 23(a), and the Committee Notes that accompany the Rule, confirm that trial judges enjoy broad discretion to sever common issues for class adjudication through partial certification, thereby providing appropriate fora in which the rights of mass tort plaintiffs can be adjudicated. *See* Fed. R. Civ P. 23(b)(3)'s advisory committee notes (1966); Fed. R.Civ.P. 23(c)(4)(A)'s advisory committee notes (1966) ("This provision recognizes that an action may be maintained as a class action as to particular issues only."); *see also In re Joint E. & S. Asbestos Litig.,* 878 F.Supp. 473, 489–90 (E. & S.D.N.Y.1995) (bifurcating

liability and damages portions of litigation pursuant to Rule 23(c)(4)(A)); *In re Tetracycline Cases,* 107 F.R.D. 719, 735 (W.D.Mo. 1985) (same); *see also United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 395, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980) (confirming the district court's inherent power to certify as to particular issues and subclasses *sua sponte*); *Doe v. Guardian Life Ins. Co. of Am.,* 145 F.R.D. 466, 478 (N.D.Ill.1992) (accord).

The language and spirit of the Federal Rules of Civil Procedure not only permit trial judges to sever issues for trial, they encourage them to employ the procedure where it would facilitate Rule 23's purpose of "achieving economies of time, effort, and expense, and promot[ing] uniformity of decision as to persons similarly situated" as well as Rule 1's overarching goal of ensuring a fair and efficient remedy for every wrong. *See Maenner v. St. Paul Fire and Marine Insurance,* 127 F.R.D. 488, 490–91 (W.D.Mich. 1989) ("In complex cases with complex issues, justice is best served if issues are separated."); *McCarthy v. Kleindienst,* 741 F.2d 1406, 1415 (D.C.Cir.1984) ("a district court should, of course, ordinarily consider such well-established methods as bifurcating the trial into liability and damages phases before denying class certification"); *Gabel v. Hughes Air Corp.,* 350 F.Supp. 624, 627 (C.D.Cal.1972) (regarding Rule 23(c)(4)(A) as a bifurcating tool meant to advance the policy of Rule 23 to "eliminate repetitive and burdensome litigation"); Manual for Complex Litigation § 33.2 (3d. ed., 1995) ("[T]he lack of such [legislative] solutions [to mass tort problems] makes innovation and creativity imperative if the aim of the Federal Rules of Civil Procedure, the just speedy, and inexpensive determination of every action, is to be realized.") (internal citations and quotations omitted).

The framers of Rule 23(c)(4)(A) considered class actions brought under Rule 23(b)(3)—characteristically disputes that involve numerous individual proofs of causation and injury—particularly well suited for certification of fewer than all issues. Their conclusion follows from the fact that Rule 23(c)(4)(A) assists in satisfying Rule

23(b)(3)'s additional class certification requirements of predominance and superiority. *See* Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b) Class Actions: History, Policy, Problems, and a Solution*, 36 SW. L.J. 743, 750 (1982); Patrick Woolley, *Mass Tort Litigation and the Seventh Amendment Reexamination Clause*, 83 Iowa L.Rev. 499, 501 (1998) ("While it is often possible to adjudicate claims involving mass economic harm without employing the issue class, this often cannot be done with mass torts."). The drafters of Rule 23(c)(4)(A) reasoned that common questions such as fraud, conspiracy, or negligence could be decided in the class action context without violating Rule 23(b)(3)'s prerequisite that issues common to the putative class members predominate over those that are individual to class members. *See* Fed. R.Civ.P. 23(b)(3) (requiring that "the court find[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members"); Fed.R.Civ.P. 23(c)(4)(A) advisory committee's notes (1966); *see also* Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b) Class Actions: History, Policy, Problems, and a Solution*, 36 SW. L.J. 743,750 (1982). Questions of individual proof of reliance or injury and actual compensatory damages that did not meet the predominance requirement would then be reserved for later jury trials. *See* Fed.R.Civ.P. 23(c)(4)(A) advisory committee's notes (1966) ("For example, in a fraud or similar case the action may retain its class character only through the adjudication of liability to the class [accomplished through bifurcation under R. 23(c)(4)(A) ]; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims."); Manual for Complex Litigation § 30.17n.703 (3d ed., 1995) (suggesting that the separation of common liability issues from individual issues "appears to have been the intention of the drafters of [Rule 23(c)(4)(A) ]").

Rule 23(c)(4)(A) also grants trial judges the flexibility to structure mass tort actions so that the superiority requirement of Rule 23(b)(3) is satisfied. Fed.R.Civ.P. 23(b)(3) (requiring that the court find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy"); *see also* Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b) Class Actions: History, Policy, Problems, and a Solution*, 36 SW. L.J. 743, 753 (1982). Superiority depends in turn upon the manageability requirement of Rule 23(b)(3)(D). Fed.R.Civ.P. 23(b)(3)(D) (requiring the court to consider "the difficulties likely to be encountered in the management of a class action"). The economies in deciding as much as possible of a complex case in one proceeding prompt courts whenever possible to structure the action through Rule 23(c)(4)(A), thereby achieving a manageable suit. *See* Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b) Class Actions: History, Policy, Problems, and a Solution*, 36 SW. L.J. 743, 753 (1982). By bifurcating issues like general liability or general causation and damages, a court can await the outcome of a prior liability trial before deciding how to provide relief to the individual class members. *See id.* at 756; Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 47 (1967) (in administering (b)(3) class actions efficiently, the bifurcating device of rule (c)(4)(A) "should serve to postpone or minimize some of the excessively frightening complications that seem overwhelming from a threshold view of the case").

Since its adoption, trial judges have relied upon Rule 23(c)(4)(A)'s severance procedure to structure unwieldy class action lawsuits in a manner that best serves the objectives of Federal Rules of Civil Procedure 1 and 23. *See, e.g., Kronenberg v. Hotel Governor Clinton, Inc.*, 41 F.R.D. 42, 45–46 (S.D.N.Y.1966) (Rules' provisions for flexibility and innovation in securities fraud action with enormous number of class members and a wide variety of alleged misrepresentations). Rule 23(c)(4)(A) has been particularly useful in the mass tort context. *See Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (in products liability action against manufacturers of epilepsy drug Rule 23 authorizes the district court in appropriate cases to isolate the common issues under

Rule 23(c)(4)(A) and proceed with class treatment of those particular issues); *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 473–74 (5th Cir.1986) (affirming trial judge's bifurcation of punitive and actual damages pursuant to Rule 23(c)(4)(A) in asbestos class action and noting that "[n]ecessity requires us to change and invent"); *In re Copley Pharmaceutical, Inc.,* 161 F.R.D. 456, 461 (D.Wyo.1995) (partial certification in class action brought by consumers against manufacturers of a bronchodilator prescription pharmaceutical, finding that "Fed.R.Civ.P. 23(c)(4)(A) [is] a highly efficient way to preserve both judicial economy and the rights of the parties in the case").

### 2. State

Most state rules and statutes grant state trial judges similarly broad discretion to sever issues for trial. For example, New York's Civil Practice Law and Rules states:

> In furtherance of convenience or to avoid prejudice the court may order a severance of claims, or may order a separate trial of any claim, or of any separate issue. The court may order the trial of any claim or issue prior to the trial of the others.

N.Y. C.P.L.R. § 603 (2000). The California Civil Practice provides:

> The court has the discretion and the power to order a separate trial of any cause of action, in furtherance of convenience or to avoid prejudice, or when separate trials would be more economic or expedient. It can do this on the motion of parties or on its own motion, in any action, or on any separate issue or any number of causes of action or issues.

3 Cal. Civ. Prac. Proc. § 25.17 (1992). *See also, e.g.,* Indiana Rules of Trial Procedure, Rule 42(b) (Supp.2001) (accord); ARCP [Alabama] Rule 42(b) (Supp.2000) (accord); Fla. R. Civ. P. Rule 1.270 (Supp.2000) (accord); Iowa Rules of Civil Procedure, Rule 186 (Supp.2000) (accord); Maine Rules of Civil Procedure, Rule 42(b) (Supp.2000) (accord); Maryland Rule 2–503(b) (Supp.2000); Mass. R. Civ. P., Rule 42(b) (Supp.2000) (accord); New Jersey Rules of Court, Rule 4:7–7 (Supp.2000) (accord); 1 Oh. Prac. Civ. R. 20(B) (2000) (accord); Idaho Rules of Civil Procedure, Rule 20(b) (Supp.1999) (accord); 16 A.R.S. [Arkansas] Rules of Civil Procedure, R. 18(b) (1997) (accord); Delaware Superior Court Rules of Civil Procedure, Rule 42(b) (1995) (accord); Multiple Claimant Litigation Act, VA Code 1950, § 8.01–267.6 (1995) ("In any combined action under this chapter, the court, on motion of any party, may order separate or bifurcated trials of any one or more claims, cross-claims, counterclaims, third-party claims, or separate issues.").

### C. Simple Bifurcation Cases: Severing Liability from Damages

Courts can make relatively simple divisions within a single claim, including separating liability issues from those of damages where bifurcation would promote the efficient disposition of the case or simplify a difficult set of issues for the jury. *See generally,* Steven S. Gensler, *Bifurcation Unbound,* 75 Wash. L.Rev. 705, 706 (2000); Susan E. Abitanta, *Bifurcation of Liability and Damages in Rule 23(b)(3) Class Actions: History, Policy, Problems, and a Solution,* 36 SW. L.J. 743, 744–45 (1982); Lewis Mayers, *The Severance for Trial of Liability from Damage,* 86 U. Penn. L.Rev. 389, 389 (1938). Trial judges regularly separate threshold questions such as jurisdiction and venue. *See, e.g., Glaspell v. Davis,* 2 F.R.D. 301 (D.Or.1942); *Clark v. Lowden,* 48 F.Supp. 261 (D.Minn.1942).

Affirmative defenses provide another category of potentially dispositive issues that may be decided with relative ease, and are therefore ripe for bifurcation. Thus, trial judges may order separate trials on the issues of release, statutes of limitations and estoppel. *See, e.g., Momand v. Paramount Pictures Distrib. Co.,* 6 F.R.D. 222 (D.Mass. 1946); *Ross v. Service Lines, Inc.,* 31 F.Supp. 871 (E.D.Ill.1940); *Seaboard Terminals Corp. v. Standard Oil Co. of N.J.,* 30 F.Supp. 671 (S.D.N.Y.1939).

Tort cases frequently provide a basis for severing liability issues from damages. *See, e.g., Houseman v. United States Aviation Underwriters,* 171 F.3d 1117, 1121 (7th Cir. 1999) (approving district judge's decision to bifurcate passenger's negligence action against pilot and airplane manufacturer

brought subsequent to plane crash where plaintiff filed suit against the manufacturer in a dilatory fashion); *Arthur Young & Company v. United States District Court,* 549 F.2d 686, 696 (9th Cir.1977) (bifurcating securities fraud class action by ordering separate juries to decide the issues of liability and damages "is well within the scope of a trial court's discretion under Fed.R.Civ.P. 42(b)"); *Schultz v. Gilbert,* 300 Ill.App. 417, 20 N.E.2d 884 (1939) (suggesting severance on retrial in personal injury suit brought against employer of negligent truck driver since the verdict showed that the jury was confused); *Garland v. Memorial Hosp.,* 60 Misc.2d 34, 301 N.Y.S.2d 144 (Sup.Ct. Albany Co.1969) (in an action to recover damages for injuries sustained by infant plaintiff in two separate accidents, defendant was entitled to separate trials; the allegations in each were unconnected, and trying them together would have prejudiced the defendant).

Separate juries have been utilized to decide liability and damages in a variety of other substantive matters. *See e.g., Francis v. City of New York and Human Resources Admin.,* 235 F.3d 763, 766 (2d Cir.2000) (affirming district judge's decision to have separate juries decide liability and damages in Title VII case brought against the City of New York); *McDaniel v. Anheuser–Busch, Inc.,* 987 F.2d 298, 304 (5th Cir.1993) (affirming district judge's decision to have separate juries decide issues of comparative negligence and indemnification action in personal injury suit brought by rail yard worker); *Anastasio v. Schering Corp.,* 838 F.2d 701, 707 (3d Cir.1988) (affirming district judge's decision to have different juries decide liability and damages in age discrimination suit); *MCI Communications v. American Telephone and Telegraph Co.,* 708 F.2d 1081, 1166–67 (7th Cir.1983) (ordering a new trial on the issue of damages alone in antitrust case comports with strictures of Rule 42(b)); *LNC Investments, Inc. v. First Fidelity Bank,* 247 B.R. 38, 38 (S.D.N.Y.2000) (bifurcating retrial and trying the question of damages in a separate proceeding before a different jury where ERISA trustees' conduct allegedly caused trust fund participants' loss).

### D. Multiple Trial Splittings and Partial Certification in Complex Litigation

Bifurcation procedure has evolved to accommodate the modern emphasis on active judicial management of complex cases, particularly in the realm of mass tort disputes. *See* Steven S. Gensler, *Bifurcation Unbound,* 75 Wash. L.Rev. 705, 708 (2000); *see also* Manual for Complex Litigation § 33.28 (3d ed., 1995) ("In mass tort cases involving large numbers of plaintiffs, a single trial of all issues before a single jury may be impractical"); Jay Tidmarsh & Roger H. Transgrud, *Complex Litigation and the Adversary System* 1289n.7 (1998) ("[T]rial splitting is more than a method by which information can be made more digestible for the factfinder. It is also a case management tool that can reduce or eliminate joinder and pretrial complexity."). Flexibility to sever complex trials into three or more parts is recognized. *See, e.g., Sanford v. Johns–Manville Sales Corp.,* 923 F.2d 1142, 1145 (5th Cir.1991) (trying liability and punitive damages before one jury and compensatory damages before another in asbestos litigation); *In re Bendectin Litigation,* 857 F.2d 290, 309 (6th Cir.1988) (affirming district court's trifurcation into liability, causation and damages in products liability suits brought against pharmaceutical company for manufacturing an anti-nausea medication for expectant mothers that allegedly caused birth defects). "Reverse bifurcation," trying damages before liability, is useful where the parties have excellent information about the likelihood of success on the issue of liability and the real sticking points are the individual issues of causation and damages. *See, e.g., Angelo v. Armstrong World Indus., Inc.,* 11 F.3d 957, 963 (10th Cir.1993) (approving reverse bifurcation in asbestos case where the procedure would save time and money and would not prevent plaintiffs from developing a history of their exposure to defendant's product).

A fortiori, trial judges have the discretion to sever issues under the more particular Rule 23(c)(4)(A) in a fashion that facilitates class adjudication of common issues. *See, e.g., Central Wesleyan College v. Gypsum Co.,* 6 F.3d 177, 189 (4th Cir.1993) ("Rule

23(c)(4) make[s] plain that district courts may separate and certify certain issues for class treatment" in approving partial conditional certification of class of asbestosis victims as to eight common issues); *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 473 (5th Cir.1986) ("necessity moves us to change and invent" in ordering common issue of the health hazards of asbestos to be tried in class action context while individuated claims would be adjudicated separately); *In re Telectronics Pacing Systems, Inc.*, 168 F.R.D. 203, 211 (S.D.Ohio 1996) (certifying class action for determination of common issue of defendant's liability in manufacturing allegedly defective pacemakers, and reserving for separate adjudication individual questions of compensatory damages); *In re Copley Pharmaceutical, Inc.*, 161 F.R.D. 456, 469 (D.Wyo.1995) (ordering common issue of liability to be tried in class adjudication context in products liability suit while ordering individual questions of causation, injury and compensatory damages claims to be tried separately before separate juries); *cf. In re Tetracycline Cases*, 107 F.R.D. 719, 730 (W.D.Mo.1985) (noting the "flexibility of limited class treatment under Rule 23(c)(4)(A)").

### III. *Seventh Amendment's Confirmation of Discretion*

#### A. History of the Seventh Amendment

#### 1. Limiting Appellate Control over Juries

The Seventh Amendment of the Constitution protects the right to a jury trial. It reads:

> In suits at common law, where the value in controversy shall exceed twenty Dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII. The historical circumstances surrounding the adoption of the Seventh Amendment support the proposition that the Reexamination Clause does not limit or alter trial judges' historically broad discretion to sever issues for trial. To the contrary, historians of procedural law agree that although bifurcation as we know it today did not exist in the courts of the American colonies, some or all of the following trial management devices did, allowing early American trial judges to exert significant control over jury verdicts, and even to wrest issues of historical fact out of the hands of jurors; remittitur, new trial, judgement notwithstanding the verdict, demurrer to the evidence, directed verdict, special verdict and nonsuit. *See* James C. Lopez, *Appellate Control of Excessive Jury Verdicts since Gasperini v. Center for Humanities: From Nisi Prius Courts to "Gasperini Hearings"*, 66 U. Cin. L.Rev. 1323, 1333 (1998).

The historical record demonstrates that the Framers' main objective in drafting the Seventh Amendment was to limit the ability of an appellate court, specifically the Supreme Court, to review de novo and overturn a civil jury's findings of fact. Nowhere is there an indication that the Framers intended to constrain the trial judge's substantial discretion to employ appropriate mechanisms of jury control.

That the first Congress was primarily concerned with the allotment of power between trial juries and appellate courts is not surprising, given the provision's political subtext. The original Constitution did not expressly guarantee a civil jury trial, an omission the Anti–Federalists feared would encourage the Supreme Court to make decisions that would undermine the power of local governments. Stanton D. Krauss, *The Original Understanding of the Seventh Amendment Right to Jury Trial*, 33 U. Rich. L.Rev. 407, 412 (1999). Citing Article III's mandate that "[t]he trial of all Crimes ... shall be by jury," as well as its declaration that the Supreme Court's "appellate Jurisdiction" would encompass both "Law and Fact," the Anti–Federalists argued that in the exercise of their appellate jurisdiction, the Supreme Court justices would be able to gut the authority of state court juries by redetermining findings of fact on appeal. *See* Letter from Thomas Jefferson to James Madison (Dec. 20, 1787) *in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 13.2.5.15 (Neil H. Cogan et al., eds., 1997) ("I will now add what I do not like [in the proposed Constitution].

First the omission of a bill of rights providing clearly and without the aid of sophisms for ... trials by jury in all matters of fact"); Letter from the Marquis de Lafayette to George Washington (Feb. 4, 1788) *in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins*, 13.2.5.24 (Neil H. Cogan et al., eds., 1997) ("We are Anxiously Waiting for the Result of the State Conventions—the New Constitution . Has Been Much Examined and Admired by European Philosophers—It Seems the Want of a declaration of Rights, of an Insurance for the trial By juries, ... are, ... the Principal Points objected to"). *But see The Federalist No. 83*, at 498 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("From these observations it must appear unquestionably true that trial by jury is in no case abolished by the proposed Constitution, and it is equally true that in those controversies between individuals in which the great body of the people are likely to be interested, that institution will remain precisely in the same situation in which it is placed by the State constitutions, and will be in no degree altered or influenced by the adoption of the plan under consideration.").

The potential for Supreme Court review of a local jury's findings was of particular concern to the Anti–Federalists who fought for the inclusion of the Seventh Amendment; many of them represented southern states that had emerged from the Revolutionary War as debtors to the northern states and England. *See* James C. Lopez, *Appellate Control of Excessive Jury Verdicts since Gasperini v. Center for Humanities: From Nisi Prius Courts to "Gasperini Hearings"*, 66 U. Cin. L.Rev. 1323, 1331 (1998). These statesmen feared that debt-related cases tried by local juries would be overturned by reviewing courts sympathetic to creditors. *See id.; see also* statement of the Hon. J. M'Dowall at North Carolina State Convention (July 28, 1788) *in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins*, 13.2.2.3a (Neil H. Cogan et al., eds., 1997) ("We know that the trial by a jury of the vicinage is one of the greatest securities for property. If causes are to be decided at such a great distance, the poor will be op-

pressed; in land affairs, particularly, the wealthy suitor will prevail.").

To satisfy Anti–Federalist concerns, James Madison raised the subject of amending the original Constitution before Congress on May 4, 1789 shortly after it convened. The Reexamination Clause was a part of that effort. In its initial form it constituted its own amendment. Article XI specifically referred to the Supreme Court in limiting the scope of reexamination:

> No appeal to the Supreme Court of the United States, shall be allowed, where the value in controversy shall not amount to one thousand dollars; nor shall any fact, triable by a jury according to the course of the common law, be otherwise reexaminable, than according to the rules of common law.

Staff of Senate Comm. on the Judiciary, Report on Amendments to the Constitution: A Brief Legislative History 7 (1985). This early version of the Reexamination Clause reveals the Framers' primary concern with limiting appellate control over jury verdicts. Article XI was eventually combined with Article XII, the predecessor of the Jury Trial Clause, which stated that "[in] suits at common law, the right of trial by jury shall be preserved." *Id.* at 7. All of the proposed amendments were sent to the states for ratification on September 26, 1789 and were adopted shortly thereafter. *Id.* at 7, 10. A provision designed to limit appellate court power should not be interpreted as one expanding that authority to control trial judges and juries.

### 2. Roles of Trial Judges and Appellate Courts

The Seventh Amendment states that no issue will be "reexaminable, than according to the rules of *the common law.*" U.S. Const. amend. VII (emphasis added). Most commentators agree that this clause refers to the English common law up to and including the common-law rules as they existed in 1791. *See, e.g.,* Richard L. Steinberg, *Re-Examination Clause Re-Examined: The Supreme Court Removes Seventh Amendment's Re-Examination Protection in Diversity Cases in Gasperini v. Center for Hu-*

manities, Inc., 52 U. Miami L.Rev. 909, 911 (1998). An independent American common law began to develop between July 4, 1776 (and perhaps before) and adoption of the Amendment, but it appears to have no bearing on the present issue.

Examination of British common-law rules on civil jury trial practice confirms the Framers' understanding that trial judges were historically accorded great discretion in controlling jury verdicts, whereas the appellate court's review of jury verdicts was limited. See, e.g., James C. Lopez, Appellate Control of Excessive Jury Verdicts since Gasperini v. Center for Humanities: From Nisi Prius to "Gasperini Hearings," 66 U. Cin. L.Rev. 1323, 1325 (1998); Richard L. Steinberg, Reexamination Clause Reexamined: The Supreme Court Removes Seventh Amendment's Protection in Diversity Cases in Gasperini v. Center for Humanities, Inc., 52 U. Miami L.Rev. 909, 911 (1998). At the time of the Seventh Amendment's adoption, the nisi prius system operated and traced its history back to the thirteenth century. See William Wirt Blume, Review of Facts in Jury Cases—The Seventh Amendment, 20 Am. Judicature Soc'y 130, 131 (1936). In more recent historical times, civil cases were tried before a jury and then final judgement was entered at a central court in London before a panel of judges. See James C. Lopez, Appellate Control of Jury Verdicts since Gasperini v. Center for Humanities: From Nisi Prius to "Gasperini Hearings," 66 U. Cin. L.Rev. 1323, 1325 (1998). Legal actions were rarely commenced at the central court in Westminster. Rather, judges from the three main common-law courts (Exchequer, King's Bench and the Court of Common Pleas) traveled to different circuits, trying cases in the litigants' home county. The circuit judges then returned the verdicts to Westminster, where the full court entered judgements. See Richard L. Steinberg, Reexamination Clause Reexamined: The Supreme Court Removes Seventh Amendment's Protection in Diversity Cases, 52 U. Miami L.Rev. 909, 911 (1998).

English practice made appellate review of jury findings a rarity. Formal appeals took the form of a "writ of error," which was heard by a higher court. Writs of error were limited to errors of law appearing in the record of pleadings, verdict and judgement. See William Blackstone Commentaries *1158, 1161 (Thomas M. Cooley 4th ed., 1899). Errors of law included discrepancies between the amounts claimed and those awarded, striking irregularities in the panel of jurors, failure to notify parties of adjournments and so on. Richard L. Steinberg, Reexamination Clause Reexamined: The Supreme Court Removes Seventh Amendment's Protection in Diversity Cases, supra, 52 U. Miami L.Rev. 909, 912 (1998) (internal citations and quotations omitted).

A motion for a new trial, if granted, could result in the "reexamination" of the entire case before a separate jury. It "was addressed to the discretion of the court [en] banc" at Westminster. See James C. Lopez, Appellate Control of Jury Verdicts since Gasperini v. Center for Humanities: From Nisi Prius to "Gasperini Hearings", 66 U. Cin. L.Rev. 1323, 1326 (1998). The plaintiff or defendant moved for a new trial in the countryside before judgement was entered by the full trial court in London. Id. Even though the motion for a new trial was fully argued at Westminster, it was not considered an appellate procedure largely because the en banc court based its decision on information provided by the trial judge about the structure of the trial and his impression of the jury. Id. "No English court ever set aside . . . a verdict except with the concurrence of the judge, or judges, who sat with the jury, saw the witnesses and heard them testify." Id. at 1327. Thus, the verdict generally stood unless the judge who "presided at the trial and heard the witnesses deemed the verdict to be unjustified, and, even then, only if he could persuade his brethren at Westminster to this view." Id. "The [en banc] court would not . . . order a new trial simply because it did not agree with the verdict. If there was no misdirection [of the jury] and there was some evidence on which the verdict could be supported, [the verdict] must stand." Id. But see Gasperini v. Center for Humanities, 518 U.S. 415, 443, 116 S.Ct. 2211, 2228, 135 L.Ed.2d 659 (1996) (Stevens, J., dissenting) ("[B]ecause the nisi prius judge often did not serve on the en banc

court, the court above was in essentially the same position as a modern court of appeals. It considered the legality of the jury's award in light of the trial judge's opinion, but without any firsthand knowledge of what had transpired below.").

The historical role of the trial court vis-à-vis the jury supports the proposition that procedural devices that permit the trial judge, rather than the appellate court, to exercise control over jury verdicts, are not limited by the Seventh Amendment. *See* Shira A. Scheindlin & John Elofson, *Judges, Juries, and Sexual Harassment*, 17 Yale L. & Pol'y Rev. 813, 838 (1999) (the Supreme Court has deemed jury control devices such as new trials, remittitur, JNOV, directed verdicts and special verdicts constitutional "even though all of these invite federal [trial] judges to take even issues of historical fact out of juries' hands."). Thus, even though the specific procedural device of bifurcation did not exist in 1791, a trial judge's decision severing issues for trial is compatible with the Seventh Amendment. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 436 n. 20, 116 S.Ct. 2211, 2224, 135 L.Ed.2d 659 (1996) (explaining that the common law is an evolving concept that supports procedural innovation in the realm of the civil jury trial because "[i]f the meaning of the Seventh Amendment were fixed at 1791, our civil juries would remain, as they unquestionably were at common law, twelve good men and true.") (internal citations and quotations omitted).

## B. *Gasoline Products:* Avoiding "Confusion" and "Uncertainty"

Not only do first principles support trial judges' broad discretion to sever issues for trial, but this historical understanding is recognized in the Supreme Court's opinion in *Gasoline Products Co. v. Champlin Refining Co. See* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931); Lesley Frieder Wolf, *Evading Friendly Fire: Achieving Class Certification After the Civil Rights Act of 1991*, 100 Colum. L.Rev. 1847, 1857 (2000). While *Gasoline Products* does not expressly mention bifurcation because the procedural posture of that case involved a potential partial new trial after appeal, the decision supports the constitutionality of the bifurcation procedure. Steven S. Gensler, *Bifurcation Unbound*, 75 Wash. L.Rev. 705, 731 (2000).

In *Gasoline Products*, the First Circuit set aside in part the verdict on a contract counterclaim because the trial court had improperly instructed the jury on damages. 283 U.S at 500, 51 S.Ct. at 515. The counterclaiming defendant, Gasoline Products Company, sought review by the Court, arguing that limiting a new trial to damages and withdrawing from the second jury's consideration the issue of liability on the contract would violate the Reexamination Clause of the Seventh Amendment. *See id.*

The Court rejected the argument that a verdict cannot be set aside in part, holding expressly that the Seventh Amendment does not always require unitary trial of a cause of action. *See id.* at 498, 51 S.Ct. 513. Nonetheless, it refused to permit a retrial of the damage issue alone, reasoning that the damage issue in that case was not separable from the liability issue. As the Court put it, "Here the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without *confusion* and *uncertainty*." *See id.* at 500, 51 S.Ct. 513 (emphasis added).

The *Gasoline Products* Court's general acknowledgment that no set of issues is inherently inseparable, and that different issues can be submitted to different juries as long as they are not presented in a way that causes juror confusion or uncertainty, remains a guiding principle in current Reexamination Clause jurisprudence. *See In re Bendectin Litigation*, 857 F.2d 290, 307 (6th Cir.1988) (the Seventh Amendment is not violated where the bifurcated issue is adaptable to a separate trial without creating jury confusion and uncertainty amounting to the denial of a fair trial); *McElroy v. Arkansas Log Homes, Inc.*, 1989 WL 18755 (D.Kan. 1989) (accord); *see also* Patrick Woolley, *Mass Tort Litigation*, 83 Iowa L.Rev. 499, 536 (1998) ("Even the Fifth Circuit has recognized outside of the highly charged class action context" that *Gasoline Products* does

not stand for the proposition that overlapping issues are inherently inseparable).

Significantly, the *Gasoline Products* Court's "confusion" and "uncertainty" standard is procedural rather than constitutional. The Court's reasoning demonstrates that the trial judge can alleviate any "confusion" or "uncertainty" by carefully instructing the jury on the proper scope of its inquiry and by employing trial management tools such as the special verdict to avoid Seventh Amendment concerns.

*Gasoline Products* emphasized that due to substantial disagreement among the parties *in that case* as to the terms of the contract, a second jury deciding damages would inevitably reexamine the findings undergirding the first jury's general verdict on liability. The Court explained that the second, damages jury could reasonably infer that the first jury's general verdict on the liability claim established the existence of a contract and its breach. *See id.* at 499, 515, 51 S.Ct. 513. The second jury could not, however, reasonably infer the precise terms of the contract from a general verdict on liability. A special verdict explaining the first jury's specific findings was needed to comprehend the scope of the breach and fix the amount of damages. *Id.* Neither the counterclaim papers nor the first jury's general verdict on liability set out the dates of contract formation and breach, a factual issue that was highly relevant to the issue of damages since the respondent had a duty to mitigate his harm. *Id.* at 500, 51 S.Ct. 513.

"Confusion" and "uncertainty" were likely to arise on retrial in *Gasoline Products* in regard to whether an oral proposal formed subsequent to the written contract called for the construction of one, two or three cross-vapor-treating towers. *Id.* ("To pass on the claim for loss of profits, the jury must know whether the contract to construct was the extent of the undertaking, and if so, the number of towers to be built"). Given the lack of specificity in the first jury's general verdict on liability together with the relevance of many of the first jury's assumed findings on liability to the issue of damages, a second damages jury would have no choice but to reexamine such factual issues as the number of towers to be built.

Avoidance of "confusion" and "uncertainty" requires that separate trials of separate issues be properly structured. The opportunity to administer the case to address the needs of a later jury was not available in *Gasoline Products,* because neither the parties nor the trial court foresaw that as a result of an appeal a later jury would need guidance from the first during a new trial. Sweeping language in *Gasoline Products* to the effect that an "issue [may not] be retried [unless it is] so distinct and separable from the others that a trial of it alone may be had without injustice" must be considered in its particular factual and procedural context. "[W]here the practice permits a *partial new trial,*" the Court held, the procedure of allowing separate juries to hear different issues may not be undertaken unless "the issue to be *retried*" is distinct and separable from the first. *Id.* (emphasis added). A well conceived bifurcated proceeding before separate juries avoids the sorts of problems that would have made a limited retrial in *Gasoline Products* unfair.

The question of whether partial certification of the common issue of compensatory liability in *Simon II* can be structured to avoid the Seventh Amendment problems of *Gasoline Products* must be considered in light of the flexibility and options available to the trial court in structuring the litigation. Class certification orders are conditional orders subject to modification, revocation or interlocutory appeal as the circumstances warrant. *See* Fed.R.Civ.P. 23(c)(1), 23(f). Denying class certification on an interlocutory appeal because of the trial judge's bifurcation plan may be premature unless it can be foreseen at this early stage in the litigation what guidance separate juries may require. Thus, the reviewing court should normally accord the trial court the maneuvering room to navigate in a developing complex litigation. There must be discretion to recraft and modify controlling issues and a special verdict form as the facts and law of the case unfold. Effective administration of complex cases requires that the trial court be afforded an optimum opportunity and avail-

able options to alleviate any "confusion" or "uncertainty" among a second set of jurors. Fed.R.Civ.P. 23(c)(1); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978).

### C. Avoiding "Confusion" and "Uncertainty" when Utilizing Separate Juries

Putting aside flexible state practice since the Supreme Court has not expressly imposed the Seventh Amendment on the states, *see Minneapolis and St. Louis R.R. Co. v. Bombolis*, 241 U.S. 211, 215, 36 S.Ct. 595, 596, 60 L.Ed. 961 (1916), *Williams II v. Foubister*, 176 Misc.2d 702, 704, 673 N.Y.S.2d 840, 841 (1998), the following discussion of how trial judges have routinely and adequately severed issues for trial subsequent to *Gasoline Products* is limited to a sampling of those federal cases in which federal district judges have successfully bifurcated proceedings under Rules 42(b) and 23(c)(4)(A).

### 1. Simple Bifurcation

Since the *Gasoline Products* Court's articulation of the "confusing" and "uncertain" standard, trial judges have routinely and properly severed issues for trial before separate juries pursuant to Rule 42(b). *See, e.g., Equal Employment Opportunity Commission v. McDonnell Douglas Corp.*, 960 F.Supp. 203, 205 (E.D.Mo.1996) (liability and damages issues are not inextricably intertwined in "pattern-or-practice" ADEA case and can therefore be bifurcated commensurate with the Seventh Amendment); *McElroy v. Arkansas Log Homes, Inc.*, 1989 WL 18755, *1 (D.Kan.1989) (bifurcated issue of causation in EPA case was adaptable to a separate trial without creating jury confusion and uncertainty amounting to unfair trial); *Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith*, 587 F.Supp. 1112, 1117 (D.Del.1984) (bifurcating patent infringement trial into separate trials on liability and damages did not violate the Seventh Amendment because "[t]he prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues"); *Carroll–McCreary Co., Inc. v. New Jersey Steel Corp.*, 1981 WL 2030 (E.D.N.Y.1981)

(denying defendants' motion to reconsider order bifurcating antitrust suit into liability and damages and holding that even though there is no "neat dividing line" between the issues, defendants' Seventh Amendment rights would be preserved).

Commensurate with the reasoning of *Gasoline Products*, trial judges frequently employ trial management procedures like special verdicts and detailed jury instructions to ensure that when issues are severed under Rule 42(b), they are clearly presented to each set of jurors. In *Whelan v. Abell*, 939 F.Supp. 44 (D.D.C.1996), for example, the second jury's finding of no monetary damage after the first jury had decided for the plaintiff on the issue of defendants' liability in a tortious interference case did not violate the Seventh Amendment. *See id.* at 45. In reaching this conclusion, the court pointed to the specificity of the trial judge's final instructions to the damages jury as well as admonitions to this jury throughout the trial regarding the limited scope of its inquiry. *See id.* at 46; *see also Houseman v. United States Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir.1999) (the trial court did not violate the Seventh Amendment in a personal injury case involving bifurcated issues where the court's jury instructions emphasized that the second jury was bound by the findings of the first).

Several courts have noted that severing issues for trial before separate juries in a particular case often protects, rather than detracts from, the parties' right to a civil jury trial. *See, e.g., In re Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed.Cir.1986) (the district court did not violate the Seventh Amendment in ordering patent issues tried before antitrust claims because "the challenged [bifurcation] order will enhance the parties' right to jury trial by making the issues the jury must consider less complex"); *Hosie v. Chicago and North Western Railway Co.*, 282 F.2d 639, 643 (7th Cir.1960) (procedural "changes are essential to the preservation of the [jury trial] right" in holding that severing liability from damages in personal injury action was well within the bounds of the Seventh Amendment).

## 2. Class and Related Actions

The court of appeals for the Second Circuit has supported the trial judge's power to sever issues for trial before separate juries in class action lawsuits under Rules 42(b) and 23(c)(4)(A) so long as there are proper safeguards. *See generally Blyden v. Mancusi,* 186 F.3d 252 (2d Cir.1999). In *Mancusi,* the trial judge bifurcated a prisoners' rights class action brought against a number of public officials into liability and damage phases. *Id.* at 257. Central to the liability award was a verdict sheet that on its face did not require findings sufficient to support class-wide liability or even liability to particular, identifiable plaintiffs. *See id.* The verdict sheet in the liability phase contained two sets of questions with respect to the defendants' responsibility for "reprisals" taken against the plaintiffs following a prison riot. *See id.* at 265. In pertinent part it read:

(A) Have the plaintiffs proven by the preponderance of the pertinent evidence that, after the retaking and liberation but prior to the time when the plaintiffs had been relocked in cells, officers engaged in reprisals constituting cruel and unusual punishment against the plaintiffs or any of them by using unnecessary or excessive force?

(B) If your answer to Question (A) is "yes," have the plaintiffs proven by the preponderance of the pertinent evidence that Karl Pfeil [former deputy assistant superintendent at the Attica prison facility] personally engaged in any such reprisals or directed or ordered that there be such reprisals or knew (or intentionally did not know) or was wantonly and deliberately indifferent to whether there were any such reprisals and did not do all that he reasonably could to stop or prevent such reprisals so that he should be held liable to the plaintiffs or any of them for any injury or other harm proximately resulting from such reprisals?

*Id.* at 260. Subsequent to the first jury's general finding of liability, the second "damages" jury was instructed as follows:

Accepting, as you must, that there were acts of reprisals, you must determine whether this plaintiff ... suffered and/or suffers and/or will suffer the effects of such.... Also you must extend to these Officers a degree of leniency and tolerance in judging whether any particular act was a reprisal. *It might or might not have been completely justified under the then circumstances to make all inmates take off all of their clothes or to lie on the ground ... but more than what was needed and justified in any or all of that was done by some Officers to some inmates and each of such inmates thereby suffered from a reprisal and is entitled to recover ....*

*Id.* at 261 (emphasis added).

The *Mancusi* court concluded that the combination of the general verdict sheet on liability and the damages jury's instructions practically mandated that the second jury redetermine which acts constituted "reprisals," an inquiry that should have been the crux of the liability phase alone. *See id.* at 268. The trial judge in *Mancusi* could have avoided reexamination of the liability issue by requesting a special verdict from the liability jury, which would have specified which acts constituted "reprisals," thereby limiting the scope of the second jury's inquiry by requiring them to award damages only to those plaintiffs injured by the acts established as "reprisals."

Trial courts have successfully severed issues for trial before separate juries in class action lawsuits, particularly in the realm of mass torts, with the accompaniment of procedural safeguards. In *In re Dow Corning Corp.,* 211 B.R. 545, 581 (Bkrtcy.E.D.Mich. 1997), the judge discussed these concerns in connection with plans for a consolidated trial of claims brought by recipients of silicone-gel breast implants. *See id.* at 589. The judge opined that any potential Seventh Amendment problems raised by certifying only some issues for class adjudication could be resolved as follows:

[E]xperienced trial judges in conjunction with parties and the panel of experts could overcome this pitfall through careful controls over the trial processes. For example, the general causation jury could be

required to give an up-or-down verdict on the possibility of silicone gel causing the disease(s) in question. The jury could then be asked a series of follow-up questions if the verdict is affirmative. The jury could be asked to quantify the risk in the form of a ratio or a percentage; that is, in a hypothetical universe with 100,000 women, if disease X would occur naturally in four women, but the statistics show that six in every 100,000 women with breast implants have a likelihood of contracting the disease, the chance that a particular breast implant claimant contracted the disease because of the implants as opposed to natural causes would be reduced to a figure of one in three. The judge presiding over the specific causation/damages · trial could open the proceedings by explaining to the jury that a prior jury had determined that silicone-gel breast implants can indeed cause disease in some numbers of persons and that it is the plaintiff's job to show that in her case, the disease, which also occurs in two out of three cases naturally, was caused by the implants.

*Id.; see also, e.g., In re Bendectin Litigation,* 857 F.2d 290, 308–09 (6th Cir.1988) (trifurcating consolidated actions for personal injuries allegedly caused by anti-nausea drug into causation, liability and damages); *In re "Agent Orange" Litig.,* 818 F.2d 145, 154 (2d Cir.1987) (affirming class certification in litigation for injuries allegedly suffered as a result of servicepersons' exposure to the herbicide Agent Orange while in Vietnam where class was certified on the basis of the centrality of the issue of the military contractor defense); *In re Copley Pharmaceutical, Inc.,* 161 F.R.D. 456, 464 (D.Wyo.1995) (establishing a bifurcated trial plan for a class action brought by users of an allegedly harmful drug to try liability alone on a class basis, and holding that "the Seventh Amendment is not violated by the separation of common issues of liability for class treatment").

## IV. *Broad Discretion to Sever Issues for Trial in Mass Tort Cases*

### A. Class Certification Orders Are Not Final Judgements

The Seventh Amendment imposes fewer constraints on trial judges severing common issues for class adjudication than trial judges severing issues for a new trial in less complex litigations. This broader discretion is due first to the respective procedural stances of such cases on appeal.

Prior to 1998, class certification orders were subject to interlocutory appeal under section 1292(b) of title 28 only if the district court was of the opinion that an immediate appeal was warranted to resolve a controlling issue of law. *See* 28 U.S.C. 1292(b) (Supp. 2000) ("When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order."); *see also, e.g., Castano v. American Tobacco Co.,* 84 F.3d 734, 737 (5th Cir.1996) ("This matter [of whether the district court abused its discretion in certifying a class action] comes before us on interlocutory appeal, under 28 U.S.C. 1292(b)"); *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1228 (9th Cir.1996) (same); *Watson v. Shell Oil Co.,* 979 F.2d 1014, 1017 (5th Cir.1992) (same). Granting interlocutory appeal and denying class certification on the ground that there was a risk of reexamination would have been considered premature as well as an unwarranted infringement on the trial judge's trial management role because class certification orders are conditional orders subject to modification or revocation as discovery unfolds and the action progresses to trial or settlement. *See* Fed.R.Civ.P. 23(c)(1); Fed. R.Civ.P. 23(c)(1) advisory committee's notes (1983) ("A determination [of class certification] once made can be altered or amended before the decision on the merits if, upon fuller development of the facts, the determination appears unsound."); *see also Prado–Steiman v. Bush,* 221 F.3d 1266, 1273 (11th Cir.2000) ("Class certification orders also are not final judgements impervious to lower court review and revision."); *cf. The National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 71 F.Supp.2d 139, 158

(E.D.N.Y.1999) (mandamus not a substitute for interlocutory appeal).

Rule 23(c)(1) specifically empowers district courts to alter or amend class certification orders at any time prior to a decision on the merits. *Prado–Steiman,* 221 F.3d at 1273–74 ("[C]lass certification determinations are so fluid and fact-sensitive that district courts should be encouraged rather than discouraged from reassessing whether the prerequisites of Rule 23 exist."). The trial court can continue to develop a special verdict form up until the moment of the charge at the trial to specify the basis of the first jury's findings of fact, thereby alleviating any "confusion" or "uncertainty" among a second set of jurors. *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).

■ Controlling law in the Second Circuit requires that a class certification order not be overruled on appeal simply because the bifurcation structure contained in the class certification order appears unclear or underdeveloped at that preliminary point of the adjudication to the reviewing court, or lacking all the necessary procedural safeguards. *Mancusi,* 186 F.3d at 272 (remanding class action to the trial court despite potential risk of Seventh Amendment conflict where issues were severed for trial before separate juries and stating that "[a]lthough we doubt the wisdom of certifying this particular class, we do not decide whether the class was improperly certified because it is not essential to our disposition of the case. We leave further proceedings to the sound discretion of the district court."); *see also Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 432 (5th Cir. 1998) ("If, *upon remand,* the district court were to certify a class action after applying the correct principles of law, care must be taken to accommodate the parties' rights to a jury trial.... Under the circumstances of a particular case, this task may be difficult, but it is by no means impossible in every instance when proper safeguards are used.") (Dennis, J., dissenting) (emphasis added). Reversing a class certification on an interlocutory appeal on the ground that a Seventh Amendment violation *may* arise at some later stage in the proceedings is at odds with appellate judicial restraint. *See Ashwander*

*v. Tennessee Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."). It is significant that after the court of appeals for the Second Circuit refused to order decertification in *Mancusi,* it was settled on remand. *See, e.g.,* Dan Herbeck, "Judge Gives Attica Riot Figure $250,000," Buffalo News, Dec. 30, 2000, at B1 (district judge awarded former inmate $250,000 incentive award for helping to bring about a $12 million settlement in *Mancusi*).

Nor is a trial judge's plan to sever issues for trial as reflected in the class certification order the sort of case that should be routinely subject to interlocutory review under Federal Rule of Civil Procedure 23(f). In 1998, the Supreme Court promulgated Rule 23(f), which permits appellate courts to accept interlocutory appeal of a class certification order. Rule 23(f) reads in pertinent part:

A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

The 1998 Committee Notes accompanying Rule 23(f) state that "[p]ermission [to appeal] is most likely to be granted when the certification decision turns on a novel or unsettled question of law, or when, as a practical matter, the decision on certification is likely dispositive of the litigation." Fed.R.Civ.P. 23(f) advisory committee's note (1998). Based on the purposes of Rule 23(f) as revealed in the Committee Notes, several courts of appeal have concurred in outlining three categories of cases for which Rule 23(f) may be appropriate. As summarized in *Waste Management Holdings, Inc. v. Mowbray,* 208 F.3d 288, 293 (1st Cir.2000):

First, an appeal ordinarily should be permitted when a denial of class status effectively ends the case (because, say, the named plaintiff's claim is not of a sufficient

magnitude to warrant the costs of stand-alone litigation). Second, an appeal ordinarily should be permitted when the grant of class status raises the stakes of litigation so substantially that the defendant likely will feel irresistible pressure to settle. Third, an appeal ordinarily should be permitted when it will lead to clarification of a fundamental issue of law.

*Id.; Prado–Steiman,* 221 F.3d at 1272–73 (11th Cir.2000) (accord); *Blair v. Equifax Check Services, Inc.,* 181 F.3d 832, 834–35 (7th Cir.1999) (accord).

■ The constitutional legitimacy of a trial judge's plan to sever issues for trial does not fit either of the first two categories of cases for which Rule 23(f) has been deemed appropriate. In determining whether the district judge's ruling on class certification is dispositive of the litigation by creating a "death knell" for either plaintiff or defendant, a reviewing court must consider whether the decision constitutes an abuse of discretion. *See Prado–Steiman,* 221 F.3d at 1273. Such a situation may exist when the district court overlooks directly controlling precedent regarding class actions, such as applying the incorrect Rule 23 standard. *See Rutstein v. Avis Rent–A–Car Sys., Inc.,* 211 F.3d 1228, 1234–35 (11th Cir.2000) (granting Rule 23(f) petition and reversing order granting class certification where in view of a prior Eleventh Circuit opinion "we do not see how plaintiffs can maintain a class action under Rule 23(b)(3) in the instant case.").

■ Merely demonstrating that the district judge's class certification decision is questionable is insufficient procedurally, as such decisions require the application of broad and flexible legal standards to unique sets of facts that do not fit squarely within prior precedent. *See id.* at 1275 n. 10 ("every litigant seeking to appeal under Rule 23(f) necessarily believes that the trial judge committed an abuse of discretion"); *see also Armstrong v. Martin Marietta Corp.,* 138 F.3d 1374, 1386 (11th Cir.1998) (en banc) ("Class certification decisions are left to the sound discretion of the district court, and in most cases the certification order can be effectively reviewed on appeal after final judgement.") (internal citation omitted).

Whether a district judge's decision to sever issues for trial will create a potential conflict with the Seventh Amendment is almost always impossible to determine at the time of first class certification early in the litigation. The proper definition of the class as well as the type of procedural safeguards necessary to ensure that a second set of jurors is neither "confused" nor "uncertain" about the scope of their inquiry may change significantly as new facts are uncovered through discovery and the nature of the case as well as its procedural posture change. *See Prado–Steiman,* 221 F.3d at 1276.

Superficially, the third category of cases—clarification of a fundamental issue of law—seems a more likely fit. Upon closer inquiry, however, interlocutory appeal on this issue of certification will seldom "lead to clarification of a fundamental issue of law" as defined by various courts of appeal. *See Mowbray,* 208 F.3d at 293. First, a reviewing court would be compelled to base its determination on an evolving factual record, requiring a changing applicable rule of law. *See Prado–Steiman,* 221 F.3d at 1275 n. 9. Moreover, interlocutory review of fundamental issues of law under Rule 23(f) is considered more appropriate if the unsettled legal issue relates specifically to the requirements of Rule 23 or the mechanics of certifying a class. *See id.* at 1275 ("[O]ne of the primary justifications for Rule 23(f) was a concern over the perceived lack of a substantial body of case law addressing the Rule 23 standards").

■ The fundamental law underlying the cause of action—i.e., the merits—is not considered in connection with the certification decision in the Second Circuit. *See Philip Morris, Inc. v. National Asbestos Workers Medical Fund,* 214 F.3d 132, 134–35 (2d Cir. 2000); *Simon v. Philip Morris, Inc.,* 194 F.R.D. 73, 75. *But see* Karin S. Schwartz et al., *Notes from the Cave: Some Problems of Judges in Dealing with Class Action Settlements,* 163 F.R.D. 369, 382 (1995) (critical of the "no merits" rule).

■ Interlocutory review under Rule 23(f) is inappropriate if the trial court's plan to sever issues for trial creates the appearance of a potential conflict with the Seventh

Amendment. The district judge's structuring of the bifurcation plan may change significantly as discovery progresses. *See Prado–Steiman,* at 1275–76 ("We reiterate ... that a class certification decision which turns on case-specific matters of fact and district court discretion as most certification decisions indisputably do—generally will not be appropriate for interlocutory review.") (internal citations and quotations omitted). Nor does the district court's decision to sever issues for trial have any direct relevance to the requirements of Rule 23. *Cf. Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1279 (11th Cir.2000) (granting Rule 23(f) petition and applying de novo standard to reverse district court's interpretation of the adequacy-of-representation test of Rule 23(a)(4)).

Courts of appeal considering whether to grant review pursuant to Rule 23(f) have further cautioned that interlocutory appeals are generally disfavored, describing them as "disruptive, time-consuming, and expensive." *Prado–Steiman,* 221 F.3d at 1276 (*quoting Mowbray,* 208 F.3d at 294). "Most of these concerns [with granting interlocutory appeals] are, if anything, even more compelling in the class action context, especially given the district court's broad authority under Rule 23(c)(1) to monitor and if necessary reconsider its class certification decision as discovery unfolds and the action progresses to trial." *Prado–Steiman,* 221 F.3d at 1276–77.

The categories of cases already considered appropriate for interlocutory appeal are not exhaustive since the authority to accept interlocutory appeals under Rule 23(f) is highly discretionary. *See id.* at 1276. But even in the unlikely event that the issue of whether a trial judge's severance plan conflicts with the Seventh Amendment were accepted for review pursuant to a Rule 23(f) petition, the reviewing court would ordinarily not vacate the class certification order on that basis alone—though advice by the appellate to the trial court on the issue and how it might be resolved would undoubtedly be welcomed by the trial court. Because class certification orders are reviewed for abuse of discretion, trial courts cannot be said to have committed such an error where their very discretionary

authority requires them to modify the structure of bifurcated proceedings as cases develop.

## B. Public Policy

American manufacturers now mass produce goods for consumption by millions using new chemical compounds and processes, creating the potential for mass injury. *See, e.g., Article, The Restatement of Torts and the Courts,* 54 Vand. L.Rev.1, 2–3 (forthcoming 2001) ("Internationalization of industry, growth of urban populations largely disconnected from producers, distribution of dangerous products, and new communication networks have created the potential for large harms with reduced ability of lay consumers and third parties to protect themselves."); *Report on Mass Tort Litigation,* (Report of the Advisory Committee on Civil Rules and the Working Group on Mass Torts, 1999) ("The source of mass torts problems lies in the economic arrangements that modern industrial society uses to produce and market its products."); Mary J. Davis, *Toward the Proper Role for Mass Tort Class Actions,* 77 Or. L.Rev. 157, 225 (1998) ("No segment of our society poses the same kinds of undifferentiated, indiscriminate risk that product manufacturers who mass market their products world- and nation-wide do."); Paul V. Niemeyer, *Remarks to the Institute for Law and Economic Policy,* 39 Ariz. L.Rev. 719, 719 (1997) ("As efficiency in production and manufacturing has increased ... design errors are multiplied by factors measured in the millions."); Richard A. Nagareda, *In the Aftermath of the Mass Tort Class Action,* 85 Geo. L.J. 295, 297 (1996) ("[M]ass torts exemplify the nation's longstanding effort to come to grips with the unanticipated consequences of modern technology."); Manual for Complex Litigation § 33.2 (3d ed., 1995) ("Courts have long recognized the need for special procedures in litigation involving multiple tort claims arising from a mass disaster, such as a hotel fire, the crash of a commercial airliner, or a major chemical explosion or oil spill. More recently, the need for special procedures has been starkly demonstrated by the rapidly increasing volume of litigation involving new types of disasters—numerous claims arising from discrete uses of or expo-

sures to widely distributed products or substances, usually over an extended period of time.").

Contemporary framers of the Federal Rules of Civil Procedure have recognized that modern adjudicatory tools must be adopted to achieve the original framers' goal of "secur[ing] the just, speedy, and inexpensive determination of every action," particularly in the realm of mass tort litigation. Fed.R.Civ.P. 1; Manual for Complex Litigation § 33.2 (3d ed., 1995) ("[I]n addressing novel problems for which legislative and rule-making solutions have not been found, the absence of precedent should not foreclose innovation and creativity. Indeed, the lack of such solutions makes innovation and creativity imperative...."); *see also* Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice*, 87 Geo. L.J.1983, 1986 (2000) ("[R]ecent trends in mass tort litigation may hint at an evolution toward greater use of inquisitorial tools within the context of the U.S. adversary system."); Kenneth R. Feinberg, *Lawyering in Mass Torts*, 97 Colum. L.Rev. 2177, 2177 (1997) ("mass torts [litigation] requires more than the traditional view of lawyering...."). Adjudicating mass torts as class actions instead of on a case-by-case basis helps fulfill the dictates of Rule 1. Mary J. Davis, *Toward the Proper Role for Mass Tort Class Actions*, 77 Or. L.Rev. 157, 168 (1998) (Rule 23(b)(3) "resulted from a recognition that situations exist where, even though class action treatment is not as clearly called for as in traditional contexts, its use might achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results") (internal citation omitted); David Rosenberg, *Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't*, 37 Harv. J. on Legis. 393, 397 (2000) (explaining that adjudicating mass torts as classable claims enables parties to "avoid[ ] the costs of unnecessarily redundant litigation of common questions.").

The very nature of injuries arising from mass production and mass marketing efforts makes trial judges' discretion to sever issues for trial one of the most necessary and natural in their arsenal of tools required for the shaping of these types of cases for efficient adjudication. In mass tort cases involving large numbers of plaintiffs, a single trial of all issues before a single jury will often be unnecessary and impracticable. Because modern marketing of most products is directed to anonymous consumers, the determination of the defendant's responsibility for its mass production and sales decisions should be aggregated to reflect that scheme. David Rosenberg, *Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't*, 37 Harv. J. on Legis. 393, 429 n. 62 (2000) ("[M]ass production decisions are not amenable to classical analysis that seeks to specify an individualized relationship between duty and right and breach and resulting harm."); Mary J. Davis, *Toward the Proper Role for Mass Tort Class Actions*, 77 Or. L.Rev. 157, 231 (1998) ("It is precisely because a product's relationship to a user or consumer is so generic that mass tort class actions on liability can fairly and efficiently be conducted."); *see also* Manual for Complex Litigation § 33.26 (3d ed., 1995) ("The key element of such [mass toxic tort] claims is generally the similarity of activity connected with the design and manufacture of a product, leading to a high volume of repetitive litigation....[T]hose mass torts in which general causation has become relatively clear over time are likely to be candidates for large consolidations or even class action treatment"). Given the potential breadth of mass tort injury, however, the harm suffered by each individual plaintiff will likely vary a great deal. *See* David Rosenberg, *Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't*, 37 Harv. J. on Legis. 393, 429 n. 62 (2000) ("After defendant's liability on common questions is established, there will be a need for individualized determinations of severity and loss, and possibly, contributory negligence or other affirmative defenses.").

Holding a consolidated trial with all or most plaintiffs against all or most defendants on common issues only, reserving the individual issues for individual or smaller consolidated trials, satisfies the class action requirements of Rule 23. Class adjudication, in turn, leads to greater efficiency and expedi-

tion in the resolution of mass tort cases. *See* Mary J. Davis, *Toward the Proper Role for Mass Tort Class Actions*, 77 Or. L.Rev., 157, 228 (1998) ("[L]imited issue classes do not suffer from the manageability/judicial integrity problems inherent in class actions certified as a whole."); *see also* Manual for Complex Litigation § 33.28 (3d ed., 1995).

Courts and commentators have acknowledged the importance of the trial judge's discretion to sever issues for trial in resolving mass tort disputes. Judges reviewing class action certifications in mass tort cases have appreciated the need for the trial judge's discretion to certify common issue classes for trial. *See, e.g., Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196–97 (6th Cir.1988) ("[W]here the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy."). The Judicial Conference is contemplating revising Rule 23 to increase emphasis on limited issue classes by making them easier to certify in mass tort cases under Rule 23(c)(4)(A). *See* Edward H. Cooper, *Rule 23: Challenges to the Rulemaking Process*, 71 N.Y.U. L.Rev. 13, 25–26 (1996) (noting that the current draft of revisions to Rule 23 includes "an increased emphasis on issue classes"); *see also* Robert G. Bone, *Rule 23 Redux: Empowering the Federal Class Action*, 14 Rev. Litig. 79, 83 (1994) (noting that the proposed revisions to Rule 23 "clearly provides that a class action need not dispose of the entire case, but can be certified for particular claims, defenses, or issues") (internal quotation omitted); William W Schwarzer, *Structuring Multiclaim Litigation: Should Rule 23 Be Revised?*, 94 Mich. L.Rev. 1250, 1263 (1996).

Nonetheless, a minority of courts have refused to certify mass tort cases, in large part because of their underlying assumption that resolving mass tort cases through the class action vehicle is a prima facie detriment to the efficient workings of the American economy. *See, e.g., In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1304 (7th Cir.1995) ("The looming infringement of Seventh Amendment rights is only one of our grounds for believing this to be a case in which the issuance of a writ of mandamus is warranted. The other[ ] as we have said [is] the undue and unnecessary risk of a monumental industry-busting error in entrusting the determination of potential multi-billion dollar liabilities to a single jury."). Resolving mass toxic tort disputes before one jury instead of on a case-by-case basis, such jurists have reasoned, would exert a sort of systematic blackmail pressure against defendants to settle for more than a particular case is worth as protection against the possibility of an enormous outlier jury award. *See id.; see also* David Rosenberg, *Mass Tort Class Actions: What Defendant Have and Plaintiffs Don't*, 37 Harv. J. on Legis. 393, 429 (2000) ("Faced with significant chance of an outlier judgement awarding catastrophically high damages, a risk averse firm would rather pay extra in settlement to avoid trial than bet the business on a single flip of a coin. [The majority in *Rhone–Poulenc* ] concluded that the only solution was to reject the litigation class action and return plaintiffs to the separate action process.").

Those with more faith in juries—a belief presumably shared by the drafters of the Seventh Amendment—have observed:

> There is good reason to doubt that litigation class actions in reality exert systematic blackmail pressure against defendants. First, defendant firms are structured to operate risk neutrally and have many means of hedging against risk, notably derived from laws limiting liability and affording protection in bankruptcy, opportunities for stockholders to diversify their portfolios, and widespread availability of liability insurance. Second, the "blackmail settlement" pressure from a single, class-wide trial is not systematically directed towards defendants alone, but rather is directed at both sides of the litigation. Risk averse class members and class counsel are no less likely than a defendant to regard a single class-wide trial with apprehension.

David Rosenberg, *Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't*, 37 Harv. J. on Legis. 393, 430 (2000). Re-

solving mass tort disputes on a case-by-case basis may actually create a systematic bias directed against plaintiffs and their attorneys because "[w]hile defendants spread the risk of adverse judgements across all test trials, each trial decides the fate of each plaintiff party on a single roll of the dice." *Id.* The defendant who successfully resolves a mass tort dispute through a class action enjoys the economic benefit of a final resolution to all proceedings, not just a single case. *See* Stephen R. Bough & Andrea G. Bough, *Conflict of Laws and Multi–State Class Actions: How Variations in State Law Affect the Predominance Requirement of Rule 23(b)(3)*, 68 UMKC L.Rev. 1, 30 (1999).

The trial court's discretion to sever issues for trial in mass toxic tort actions also facilitates the tort law system's twin aims of compensating those injured by others and deterring tortfeasors by requiring them to pay for the harm they cause. *See,* Mary J. Davis, *Toward the Proper Role for Mass Tort Class Actions,* 77 Or. L.Rev. 157, 228 (1998) (outlining the purposes of the modern tort system); *Note, The Restatement of Torts and the Courts,* 54 Vand. L.Rev. 1, 2–3 (forthcoming 2001) (same). Specifically, severing issues for trial facilitates the common adjudication of classable mass toxic tort claims, which in turn helps meet tort adjudication goals. *See* Mary J. Davis, *Toward the Proper Role for Mass Tort Class Actions,* 77 Or. L.Rev. 157, 231 (1998) ("It does not make sense to reject the class action in mass torts because the number of victims is so large and the harm so great. This is precisely why the class action is appropriate—one culpability determination would greatly increase the efficiency of the court system while recognizing the reality of the product marketplace."). Commentators have emphasized that only by *litigating* mass tort class actions can parity between plaintiffs and defendants be realized, thereby ensuring that the deterrence, compensation and administrative productivity goals of the tort system are met. David Rosenberg, *Mass Tort Class Actions: What Defendant Have and Plaintiffs Don't,* 37 Harv. J. on Legis. 393, 414 (2000) (the standard case-by-case process for adjudicating mass tort claims as well as market, legislative or regulatory alternatives to litigating class actions systemically denies class action efficiencies to plaintiffs while affording precisely those same advantages to defendants); Charles Fried & David Rosenberg, *Making Tort Law: The Comparative Advantage of Courts and Legislatures* (Dec. 15, 2000) ("Tort law thus provides a decisionmaking authority that is not simply separate from, but also more decentralized and sometimes more insulated against political pressures than are legislatures and agencies. As such, the tort system serves as a check on its counterparts being captured by the businesses they oversee or otherwise failing to exercise their power optimally") (internal quotations omitted). Significantly, the Federal Rules of Civil Procedure, which codify the trial judge's historic discretion to structure trials, were adopted to provide a forum for those injured persons seeking private remedies in the courts, including those remedies arising under tort theory. *See Note, Compensation for Mass Private Delicts: Evolving Roles of Administrative, Criminal, and Tort Law,* ___ U. Ill. L.Rev. ___ (forthcoming 2001) ("Broad as-of-right discovery, flexible pleadings, consolidation of related cases, multidistrict transfers, long-arm statutes, as well as relaxation of exclusionary evidence rules, tended to favor those plaintiffs seeking help from the courts. Amendments to the Rules as, for example, those widening Rule 23 on class actions, have tended to enhance the power of plaintiffs.").

Mass tort lawsuits do tug at the boundaries of the traditional bipolar trial. *See* Report on Mass Tort Litigation 4–5 (Report of the Advisory Committee on Civil Rules and the Working Group on Mass Torts to the Chief Justice of the United States and to the Judicial Conference of the United States) (February 15, 1999). Federal courts have acknowledged, however, that there is sufficient conceptual space in our legal system to resolve the difficulties in an efficient and just manner. *See id.* Federal courts regard judicial flexibility as imperative in the realm of mass torts until effective legislative and administrative solutions to these problems are adopted. *See id.*

In summary, the language and spirit of the Federal Rules of Civil Procedure together

with the history of the Seventh Amendment and subsequent case law demonstrate that the Reexamination Clause should not be read as a mandate to constitutionalize civil procedure in order to frustrate the class action mechanism—a device created to foster "judicial economy and efficiency by adjudicating, to the extent possible, issues that affect many similarly situated persons." *In re Joint Eastern and Southern District Asbestos Litig.*, 129 B.R. 710, 802 (E.D.N.Y. & S.D.N.Y.1991) (*citing Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979)).

## C.  Cases Deviating from the Norm

A few recent severance cases have deviated from the norm.  In the first, a class action by hemophiliacs complaining of having been infected with HIV because of manufacturers of an element of blood they required to stay alive, a majority of a court of appeals panel, over a strong dissent, issued a writ of mandamus ordering the trial court to decertify a class in part because it found that the trial court's plan to sever for trial common and individuated issues created a risk of conflict with the Seventh Amendment. *In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302–04 (7th Cir.1995). *See, citing with approval: Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 628 (5th Cir.1999); *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1085 (6th Cir.1996); *Castano v. American Tobacco Co.*, 84 F.3d 734, 748 (5th Cir.1996); *Fisher v. Bristol–Myers Squibb, Co.*, 181 F.R.D. 365, 368 (N.D.Ill.1998). *See, disapproving, or contra: Blyden v. Mancusi,* 186 F.3d 252, 271 (2d Cir.1999) (in view of the generality of the trial judge's verdict sheet, bifurcation of trial into liability and damages phases violated the Seventh Amendment, but refusing to decertify the class on the ground that further proceedings should be left "to the sound discretion of the district court"); *In re Paoli Railroad Yard PCB Litig.*, 113 F.3d 444, 452 n. 5 (3d Cir.1997) ("[The] Seventh Amendment prohibition is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues."); *Valentino v. Carter–Wallace,* 97 F.3d 1227, 1232 (9th Cir.1996) ("[T]his constitutional [Seventh Amendment]

concern of the *Rhone–Poulenc* court may not be fully in line with the law of this circuit."); *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir.1978) (remanding class certification in antitrust action for further development by the trial judge where the trial judge's severance of the liability and damage issues merely evoked Reexamination Clause concerns); *Windham v. American Brands, Inc.*, 539 F.2d 1016, 1021–22 (4th Cir.1976) (reversing and remanding with instructions to sever violation issue for separate trial where the trial court made no attempt to sever issues for trial to help satisfy Rule 23's manageability requirement in dismissing complex cigarette price-fixing case); *In re Copley Pharmaceutical, Inc.*, 161 F.R.D. 456, 461 (D.Wyo.1995) ("[The] analysis [in *Rhone–Poulenc* ] effectively eviscerates Fed.R.Civ.P. 23(c)(4)(A) ... tak[ing] away one of the sharpest instruments available to trial courts managing mass tort litigation"); *In re Tetracycline Cases,* 107 F.R.D. 719, 727 (W.D.Mo.1985) ("[T]he court should always consider the possibility of determining particular issues on a representative basis as permitted by Rule 23(c)(4)(A) ... to make the common issues in the class predominate for purposes of Rule 23(b)(3)"); Stephen R. Bough & Andrea G. Bough, *Conflict of Laws and Multi–State Class Actions: How Variations in State Law Affect the Predominance Requirement of Rule 23(b)(3),* 68 UMKC L.Rev. 1, 20 (1999) ("[T]he entire opinion [in *Rhone–Poulenc* ] is void of any discussion of Rule 23"); Patrick Woolley, *Mass Tort Litigation and the Seventh Amendment Reexamination Clause,* 83 Iowa L.Rev. 499, 525 (1998) ("There can be no question ... that the Reexamination Clause must constitutionalize some rules of preclusion. This reading [of the Reexamination Clause in *Rhone–Poulenc* ] would represent an extraordinary extension of preclusion law. We do not normally require that a party be protected against an amorphous risk that a state actor—in this case the jury—will violate its legal obligations."); Steven S. Gensler, *Bifurcation Unbound,* 75 Wash. L.Rev. 705, 733 (2000) ("The risk of re-examination presented when separate juries hear bifurcated issues calls for sound case manage-

ment, not avoidance of the procedure."); John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L.Rev. 1343, 1440 (1995) ("This Seventh Amendment objection seems a weak argument" and suggesting that, if a limited class were certified after a finding that plaintiffs had a probability of success, "it seems doubtful that even the Seventh Circuit would find a Seventh Amendment violation.").

The *Rhone-Poulenc* majority was concerned that a negligence decision by the one jury might be reexamined by a second in determining the comparative negligence of individual plaintiffs. There is some doubt about whether a second jury would be reexamining the first jury's findings of the defendant's negligence when it found the plaintiff also contributorily liable to some percentage (assuming that the first jury did not put an end to the case by finding no negligence). In any event, the central issue in the present case—fraud—can stand without appreciably cluttering or confusing a second jury's work on such matters as reliance or statutes of limitations. There is also force to the dissenting judge's view in *Rhone-Poulenc* that the trial judge could modify severance orders, other procedural decisions and certification rulings to avoid any Seventh Amendment problems while addressing the needs of the parties as the proceeding developed. As she wrote:

> If the problems envisioned by the majority were to materialize at a class trial, Judge Grady could always modify his earlier ruling or even abandon it altogether, and his response in that regard would be reviewable by this court on direct appeal, once the actual ramifications of the certification order were evident.

*Rhone-Poulenc*, 51 F.3d at 1308.

*Rhone-Poulenc* provides no generally applicable rationale limiting this court's severance discretion in the instant case. The majority acknowledged, in accordance with the reasoning of *Gasoline Products*, that dividing issues between separate trials and juries is not an inherent barrier to bifurcation procedure. *See id.* ("Bifurcation and even finer divisions of lawsuits into separate trials are authorized in federal district courts ... [a]nd

a decision to employ the procedure is reviewed deferentially"). And, the dissent noted:

> [T]he district court's certification order does not present such an obvious Seventh Amendment problem, as it will not deprive defendants of their right to have a jury resolve any issue. Instead, the Seventh Amendment violation the majority envisions might appear, if at all, only in a phase II trial. It is thus a possible but by no means imminent consequence of the certification order. And if any constitutional problem were to materialize, it would be reviewable either by this court after the class trial or by other courts reviewing phase II trials. In either event, the reviewing court would then have a record to examine, rather than speculating about a potential constitutional violation, as the majority does here.

*Id.* at 1307.

The fact that some evidence would overlap does not make the severance useless. The first jury's finding would certainly enhance the possibility of settlement even if it found for the plaintiff, and would limit the issues to be tried by any other jury. Assisting in inducing settlement as a result of bifurcation is an appropriate reason for trial courts to utilize this technique. *See* Fed.R.Civ.P. 16(c) ("[T]he court may take appropriate action with respect to ... a settlement...."). It is noteworthy that such practical considerations were reflected in the fact that *Rhone-Poulenc* was ultimately settled, the result of decertification ordered by the court of appeals on mandamus having been to sharply reduce the value of the case to those suing on behalf of hemophiliacs injured by tainted blood. *See, e.g.,* Barry Meier, "Hemophiliacs Join Forces in HIV Suit," L.A. Daily News, at T1 (June 24, 1996) (defendant's offer to settle the case for $100,00 per claimant fell far below plaintiffs' expectations before the Seventh Circuit decertified the class).

The *Rhone-Poulenc* majority's suggestion that trial judges "carve at the joint" when possible in severing issues for trial is useful. *See Rhone-Poulenc*, 51 F.3d at 1302. Yet, while an action is pending in the trial court, it is a living, developing and changing entity

so that a trial court's compelled, routine, premature denial of severance may do unnecessary mortal damage to what could have been a viable and fair class action. It is a mistake to underestimate the ability of juries to appropriately follow instructions summarizing the chance of jury conflicts. *See, e.g.,* Kevin M. Clermont & Theodore Eisenberg, *Anti–Plaintiff Bias in the federal appellate courts,* 84 Judicature 128, 133 (2000) ("If trial attorneys fall prey to misperceptions, then the more distanced appellate judges should be even more susceptible to misperceptions about the adjudicators."). "The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex. v. Pinson,* 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482 (1931) (Holmes, J.).

Even if this court were to accept the legal rationale and policy underpinnings of the majority decision in *Rhone–Poulenc,* it is nonetheless inapplicable to the proposed tentative trial structure of *Simon II.* First, the majority's determination that the trial judge's class certification order violated the Seventh Amendment was only one of three factors it considered in ordering the class decertified. *See Rhone–Poulenc,* 51 F.3d at 1303 ("But the looming infringement of Seventh Amendment rights is only one of our grounds for believing this is to be a case in which the issuance of a writ of mandamus is warranted. The others as we have said are the undue and unnecessary risk of a monumental industry-busting error in entrusting the determination of potential multi-billion dollar liabilities to a single jury when the results of the previous cases indicate that the defendant's liability is doubtful at best and the questionable constitutionality of trying a diversity case under a legal standard in force in no state."). This court has already considered one of the other factors relied upon by the majority—conflict of laws—and found it inapplicable to the Tobacco litigation. *See Simon v. Philip Morris, Inc.,* 124 F.Supp.2d 46 (E.D.N.Y. 2000).

Second, the "looming possibility" of a Seventh Amendment violation in *Rhone–Poulenc*

stemmed from severing negligence and comparative negligence. *See Rhone–Poulenc,* 51 F.3d at 1302–03; *see also Castano,* 84 F.3d at 750 ("Severing a defendant's conduct from comparative negligence results in the type of risk that our court forbade"); *Arch v. The American Tobacco Co., Inc.,* 175 F.R.D. 469, 491 (E.D.Pa.1997) ("The Court could not possibly bifurcate the issue of defendants' negligence and plaintiffs' comparative negligence."). Since comparative negligence requires a comparison between the defendant's and the plaintiff's conduct, there is arguably a risk that in apportioning fault, the second jury could reevaluate the defendant's fault, even going so far as to reapportion 100% of the fault to the plaintiff. *See Castano,* 84 F.3d at 750; *see also* Restatement (Third) of Tort: Apportionment of Liability § 3 (Proposed Final Draft No. 1, 1998) ("[C]omparative responsibility is predicated on the core idea that the factfinder can compare the responsibility of various actors"). In contrast, severing general compensatory liability based upon fraud from individuated issues such as specific reliance in *Simon II* establishes a clearer dividing line between the first jury's focus, which will be the defendant's conduct, and the second jury's focus, which will be the plaintiff's conduct, thereby minimizing the risk of reexamination.

V. *Application to the Simon II Trial Structure*

A. Severing in Opt–Out Compensatory Class and Non–Opt–Out Punitive Class under Rule 42(b) May Be Appropriate

■ The trial court is free to consider arguments of the parties considering bifurcation of the general compensatory liability issue and the punitive damages issue. Separating these issues for trial before the same jury may ensure the expeditious and economic resolution of this case. Regardless of the jury's verdict, resolution of the compensatory liability issue could well end litigation of the other issues. *See* Wright & Miller, Federal Practice and Procedure § 2388 (1995 ed.) ("If a single issue could be dispositive of the case or is likely to lead the parties to negotiate a settlement, and resolution of it might

make it unnecessary to try the other issues in the litigation, separate trial of that issue may be desirable to save the time of the court and reduce the expenses of the parties."); *see also, e.g., In re Beverly Hills Fire Litig.,* 695 F.2d 207, 216 (6th Cir.1982) (the trial judge properly bifurcated causation from other issues in the case where the other issues might be mooted by trial of the causation issue). Severing compensatory liability and punitive damages may also be appropriate in this case because of the unusual complexity of the issues, which would be difficult to present to a jury simultaneously in comprehensible fashion. *See Article, Routine Bifurcation of Negligence Trials* 14 Vand. L.Rev. 831, 840–41 (1961). Nor does the bifurcation plan proposed preliminarily conflict with the Seventh Amendment, since both sets of issues will be submitted separately to a single jury as to at least some plaintiffs. *See* 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2391 (1995 ed.); *see also Greenhaw v. Lubbock County Beverage Ass'n,* 721 F.2d 1019, 1025 (5th Cir.1983); *Hosie v. Chicago & North Western Ry. Co.,* 282 F.2d 639, 642–43 (7th Cir.1960).

B. Certifying an Issue Class to Resolve General Compensatory Liability under Rule 23(c)(4)(A) May Be Appropriate

■ The proposed structure of the *Simon II* litigation may entail certifying an issue class under Rule 23(c)(4)(A) to resolve the common issue of general compensatory liability in this court. If the jury returns a verdict favorable to the defendants the case will come to a sudden stop. In the event of an affirmative verdict on the common issue of general compensatory liability, the individual compensation claims of each class member not decided in this court would then be transferred to appropriate federal district courts throughout the country for decisions on such issues as individual causation, individual damages and individual statutes of limitations defenses. *See Simon v. Philip Morris, Inc.,* 124 F.Supp.2d 46, 49 (E.D.N.Y.2000).

This court can ensure that the issue of general compensatory liability is decided so that transferee judges can properly instruct subsequent juries on the proper scope of their inquiry into each class member's actual compensatory damages. For example, the court may request the jury deciding general compensatory liability to return a special verdict pursuant to Rule 49(a) specifying the factual bases for its decision. Rule 49(a) reads:

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate.

Fed.R.Civ.P. 49(a). This special verdict form could then be read to the second set of juries deciding actual compensatory damages for individual class members as binding findings of fact.

A question may be raised as to whether the special verdict forms that may accompany the severance of issues for trial render the proposed trial structure unmanageable under Rule 23(b)(3). *See Mancusi,* 186 F.3d at 271 ("To be sure, a proper liability trial involving this particular class could have been conducted, as described above. One may question, however, whether the complexity of such a trial and the special verdict it would entail might not have outweighed any benefits."). Severing issues for trial so that common issues can be adjudicated in the class action context enhances rather than detracts from the manageability of such cases. *See, e.g.,* Mary J. Davis, *Toward the Proper Role for Mass Tort Class Actions,* 77 Or. L.Rev. 157, 228 (1998) ("[L]imited issue classes do not suffer from the manageability/judicial integrity problems inherent in class actions certified as a whole."). Here, too, the duplicative and widespread nature of the defendants' alleged fraudulent conduct together with the specific findings of fact that will arise from the sample compensatory trials may serve to reduce the potential complexity of the special verdict form. In structuring the case the trial court will have the

advantage of knowledge of evidence and law applicable to Tobacco litigation acquired in many hearings and an extensive trial.

Procedural safeguards such as the special verdict and carefully crafted jury instructions may enable both this court and transferee courts to present the severed issues to juries in a fashion that is neither "confusing" nor "uncertain." *See also In re Paoli Railroad Yard PCB Litig.*, 113 F.3d 444, 452 n. 5 (3d Cir.1997) (even if the district court had ordered a second trial on liability before a different jury, "the district court's bifurcation of the case would not appear to have offended the Seventh Amendment" because although the second liability jury would have considered the foreseeability of plaintiffs' prospective injuries, the first jury determining causation did not because the district court did not instruct that jury to do so); *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 216–17 (6th Cir.1982) (confirming severance of liability from causation issues in mass tort lawsuit).

Should this court decide to certify a *Simon II* opt-out general compensatory liability class under Rule 23(c)(4)(A), the proposed trial structure may appear uncertain or underdeveloped to a reviewing court examining the order on interlocutory appeal. Since the factual record of the case will have yet to be developed at the certification stage, the court of appeals could decline to grant interlocutory appeal under Rule 23(f), allowing further shaping of the structure of the case as the factual record evolves. *See* Fed.R.Civ.P. 23(f) advisory committee's notes (1998) ("The district court, having worked through the certification decision, often will be able to provide cogent advice on the factors that bear on the decision whether to permit appeal."); *see also* "Dialogues with the Trial Bench: Some Implications of Rule 23(f)," Address at the Georgetown University Law Center Continuing Legal Education 4th Annual Mass Tort Litigation Institute (Nov. 4–5, 1999) ("I suggest that this change [the enactment of R. 23(f)] puts the courts in a conversational rather than a combative mode.").

## VI. *Summary*

As previously noted in its related Tobacco decisions (summarized in *Simon v.*

*Philip Morris, Inc.*, 124 F.Supp.2d 46, 50–51 (E.D.N.Y.2000)), this court, in deciding how to structure *Simon II*, cannot ignore two fundamentals: (1) it is dealing with human institutions that, unlike the precise machinery of atomic physicists with variances approaching zero, must interpret the law reasonably, with some tolerance if it is to effectively serve its protective role; and (2) it is responding to a complex nationwide fraud allegedly created by defendants. The basic premise of law in this country remains that for every wrong there is a remedy, an effective and realistic remedy. The class action is an outgrowth of history and equity that changed the procedural-substantive balance of rights of those whose claims are aggregated. Both the supporters and critics of Rule 23 perceive this. The failure thus far to appreciably modify Rule 23 suggests that the present balance created by viable class actions is still approved by the rulemakers. *See generally* Judith Resnick, *From Cases to Litigation*, 66–67 (May 1990) (contrast between substantial controversy that greeted 1966 revisions of class action rule and absence of objections to consolidation pursuant to Multidistrict Litigation Act); Robert L. Carter, *The Federal Rules of Civil Procedure as a Vindicator of Civil Rights*, 137 U. Pa. L.Rev. 2179, 2184–2190 (1989). Trends in case law, the history of the Federal Rules of Civil Procedure and the United States Constitution, and current scholarship involving mass torts suggest that severing the issue of general compensatory liability from individual compensatory issues is appropriate in *Simon II*.

## VII. *Conclusion*

The parties have a wide range of possibilities with respect to certification, severance and other issues available for consideration by the court. The Seventh Amendment, while it needs to be considered, does not substantially inhibit them or the trial court.

SO ORDERED.